**Javon JENKINS and David L. Terrafino, individually and on behalf of others similarly situated, Plaintiffs,**

v.

**UNION CORPORATION and Transworld Systems, Inc., Defendants.**

No. 96 C 3440.

United States District Court, N.D. Illinois, Eastern Division.

March 30, 1998.

---

**2.** This ruling does not affect the claim of the minor plaintiff Rebekah Dassion.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Tara Leigh Goodwin, Michelle Ann Weinberg, Edelman & Combs, Chicago, IL, for Javon Jenkins.

James S. Shedden, Mary Elizabeth Philipps, David J. Phillips, Catherine Lee Gemrich, Beeler, Schad & Diamond, P.C., Chicago, IL, for David L. Terrafino.

Ronald S. Adelman, Law Offices of Ronald S. Adelman, Chicago, IL, for Union Corporation, Transworld Systems, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In this putative class action,[1] plaintiffs Javon Jenkins and David Terrafino allege that defendant Union Corporation and its subsidiary, Transworld Systems, Inc., violated numerous provisions of the Fair Debt Collection Practices Act ("FDCPA" or "Act") and the Illinois Collection Agency Act ("Illinois Act"). The three-count complaint stems from a series of form debt collection letters that the defendants sent on behalf of their creditor-clients.

The complaint claims that defendants violated the Act in four ways: 1) the letters contained false and deceptive language; 2) the letters overshadowed, contradicted, and obfuscated plaintiffs' rights to contest the validity of their debts; 3) the letters violated the FDCPA's proscription against threatening litigation that defendants had no intent or authority to bring;[2] and. 4) the letters tried to collect service fees prohibited by both the FDCPA and the Illinois Act. The parties also contest whether defendant Union is sufficiently involved in debt collection activities to be held liable for the alleged statutory violations. Before the Court are the plaintiffs' motion for partial summary judgment on the FDCPA claims against defendant Transworld only, and defendants' cross-motion for summary judgment on all counts.

---

1. Earlier in the litigation, the plaintiffs moved for class certification. The Court denied the motion without prejudice in light of the pending potentially dispositive motions. *See Allen v. Aronson Furniture Co.,* 971 F.Supp. 1259, 1261 (N.D.Ill. 1997) (in appropriate cases, district court may address motion for summary judgment before deciding whether to certify a class).

2. Transworld's response to the plaintiffs' summary judgment motion argues that this claim is waived because Terrafino failed to include it when the Court consolidated his suit with Jenkins'. Plaintiffs respond that we should address the claim because its omission from the consolidated complaint was inadvertent. Despite Transworld's objection, we will consider this claim because we find that the plaintiffs intended the consolidated action to incorporate all claims in their original complaints. This ruling will not prejudice Transworld; Terrafino's complaint

## RELEVANT FACTS[3]

### A. Union Corp. and Transworld Systems, Inc.

#### 1. Union's Business

Defendant Union is a publicly held corporation whose principal place of business is in Greenwich, Connecticut. Def.'s Facts ¶ 5. Union describes itself as a "pure financial services company," with a 1996 net worth of approximately $63 million. Pl.'s Add'l Facts Ex. B (Union Annual Report at 2–3). Through its five operationally decentralized subsidiaries, Union provides telephone-based services, including accounts receivable management, customer service, billing inquiry, credit authorization, and pre-charge-off receivables. *Id.* At the time of the events in this suit, Union's "core business" was accounts receivable management. *Id.*

Union is not licensed as a collection agency, is not assigned accounts for collection, generates no collection letters, and makes no telephone calls to debtors. Def.'s Facts ¶ 8. Its corporate headquarters currently employs fewer than fifteen people, who are responsible for corporate strategy, policy and finance. Pl.'s Add'l Facts ¶¶ 6–7. Defendants describe Union's headquarters simply as the place where "they count the money." Dunn Dep. p. 30.

In 1985 Union purchased Transworld Systems Inc. from Gordon Dunn and others for $28 million. Def.'s Facts ¶ 9. Union and Transworld had no connection before the purchase. Dunn Dep. p. 17. Before 1985, Union owned a variety of enterprises, including an airline in Puerto Rico, a foundry, a military contractor, and another debt collection agency. Pl.'s Add'l Facts ¶ 1. The Transworld purchase was part of Union's plan to sell its unprofitable entities and focus on more profitable and growth-oriented businesses. Pl.'s Add'l Facts ¶ 2. Since purchasing Transworld, Union has not changed Transworld's policies and practices. Def.'s Facts ¶ 10.

#### 2. Transworld's Business

Transworld Systems offers debt collection services from 139 offices nationwide, including Illinois, and has its principal place of business in Rohnert Park, California. Def.'s Facts ¶ 10. Transworld has a net worth in excess of $11 million, does not have any significant debt, and does not receive loans from Union. Def.'s Facts ¶¶ 6, 10. Transworld is Union's most profitable subsidiary and, at the time of the events in this case, was responsible for a large portion of Union's profits. Pl.'s Add'l Facts ¶ 5, Ex. B (Union Annual Report). Transworld distributes to Union an annual dividend that consists of all income beyond Transworld's immediate and long-range cash requirements—an amount Transworld determines on its own. Dunn Dep. p. 32–33.

#### 3. The Companies' Corporate Structure

As a Union subsidiary, Transworld has one officer who sits on Union's board of directors. Def.'s Facts ¶ 9. Gordon Dunn, Transworld's former president and current chairman of the board, is that person. *Id.* His employment agreement is signed by both entities. Pl.'s Add'l Facts ¶ 6. Nicholas Gill, Union's vice president, treasurer and secretary, is also a director of Transworld. Dunn Dep. at 26. Besides Dunn and Gill, the companies do not have common directors or officers. Def.'s Facts ¶ 9. Transworld's current president, George Macaulay, does not do any consulting for Union or for any of Union's other subsidiaries or affiliates. *Id.* ¶ 9.

Transworld does not share its office facilities, postal meters, insurance policies or a computer system with Union or any of Union's other subsidiaries or affiliates. *Id.* Union maintains no offices or employees in California, Transworld's base, and it does not own or lease any of Transworld's offices. Transworld and Union maintain their own accounting departments and keep separate corporate minute books. *Id.* Transworld has, however, used Union's auditors. *Id.*

gave it notice of this claim and the plaintiffs have consistently pursued it in their briefs.

**3.** The facts are derived from statements that the parties filed with this Court under the Northern District of Illinois' Local General Rule 12(M)-(N).

### B. Transworld's Debt Collection Practices

Transworld provides debt collection services to more than 40,000 creditor-clients, both in its own name and under the name Credit Management Services. Pl.'s Facts ¶¶ 5–6. Creditor-clients initiate debt collection by filling out a "Start Service" transmittal slip—the only document needed to trigger collection efforts for a particular debtor—and mailing it to Transworld headquarters in California. Def.'s Facts ¶ 19. The pre-printed "Start Service" slip directs the creditor to provide the debtor's name, address, date of the latest payment or charge, and the total debt figure to be collected. *Id.* Ex 1. The form specifically instructs the client to *"COMBINE* ALL INTEREST, FINANCE CHARGES AND OTHER FEES TO WHICH YOU ARE *LEGALLY ENTITLED.* ONE *TOTAL* FIGURE." It also provides a space for the creditor-client to indicate whether the creditor wants "diplomatic" or "intensive" collection efforts, and whether the service should include collection of a "NSF check." *Id.* The Start Service slip does not designate a space for the creditor to indicate that the debt arose from a "stopped check." *Id.*

Transworld is aware that the law prohibits attempting to collect fees unauthorized by law or contract. Accordingly, Transworld's "installation packet," a manual given to clients, instructs clients to include in the amount sought the fees "legally due" to them. Pl.'s Facts ¶¶ 30–33. Transworld also relies on its creditors to state with accuracy the amounts legally due and owing from the debtor, the date the debt arose, and the debtor's last known address. Def.'s Facts ¶ 20. Transworld assumes that its clients add "service fees" to dishonored checks; these clients have the option of sending a pre-printed Transworld collection letter that states, "The amount due includes a service fee, which must also be paid." Pl.'s Facts ¶ 32. It is not Transworld's procedure or policy to compound the outstanding debt with a service charge when the debtor has stopped payment. Def.'s Facts ¶ 22. Nevertheless, Transworld does not specifically advise the creditor-client against collecting on checks stopped because of a debtor-merchant dispute. Pl.'s Facts ¶ 36. Transworld does instruct creditors that they may not attempt to collect from debtors who have filed for protection under bankruptcy laws. *Id.* ¶ 35.

If a creditor has a question about its legal entitlement to a particular charge, Transworld refers the creditor to its own attorney, and has issued memos instructing its sales representatives to do the same. Def.'s Facts ¶ 24. Transworld does not determine the propriety of creditors' additional fees or give any legal advice. *Id.* ¶ 20.

Transworld's efforts to collect debts from plaintiffs Jenkins and Terrafino surfaced in a series of standard form letters mailed to each approximately 14 days apart. None of the letters to Jenkins or Terrafino identifies or makes any reference to Union, or otherwise indicates any relationship between Transworld and Union. Def.'s Facts ¶ 25. Neither Jenkins nor Terrafino contacted Transworld to dispute their debts or to request validation of the total debt figures stated in their letters. Def.'s Facts ¶ 23.

### C. Plaintiff Jenkins

In October 1995, Javon Jenkins bought a used car from Montell Pontiac in Blue Island, Illinois. She delivered a personal check for $1000, a portion of the purchase price. On October 17, 1995, Jenkins stopped payment on the check, claiming that the car was defective. Def.'s Facts ¶ 12; Pl.'s Facts ¶ 3. Montell Pontiac responded on October 23 by completing Transworld's "Start Service" form and authorizing collection efforts on Jenkins' debt. Def.'s Facts ¶ 14. Montell indicated on the form that $1,025 was legally due and owing from Jenkins, and requested "intensive" efforts to collect it. Montell also marked, erroneously, an "X" in the space for "NSF [dishonored] check," which added $25 to Jenkins' $1000 debt. Def.'s Facts ¶ 16, Ex. 1.

Using its own name, Transworld mailed Jenkins three "intensive" standard form collection letters dated November 1, 13 and 24, 1995, seeking the $1,025 that Montell Pontiac claimed was due. The first letter included text designed for collecting dishonored checks:

— SPECIAL NOTICE—

Our client has requested that we contact you regarding your check which has been returned by the bank and payment refused. We realize this could be an oversight on your part and not willful disregard of an obligation.

However, intentional payment with a dishonored check for goods or services can lead to serious consequences.

The amount due includes a service fee, which must also be paid. To avoid any possible misunderstanding, it is important you immediately make payment to or arrangements with [Jerry Montell Pontiac].

In smaller print located beneath the main text and just above the printed directive "detach and return with payment" was a validation notice required by the FDCPA:

Transworld Systems, Inc. is a licensed collection agency and any information obtained from you will be used for the purpose of collecting this debt. All portions of this claim shall be assumed valid unless disputed within thirty days of receiving this notice. If disputed in writing, verification of the debt will be provided to you. If the original creditor is different from the above named creditor, the name and address of the original creditor will also be provided.

The second form letter, dated November 13, reads:

IMPERATIVE—Grace period about to expire. Our client shows an unpaid account in the above stated amount appearing legally due and owing by you.

This account has been referred to our agency and we are authorized to pursue collection. With offices nationwide, a number of alternatives are available to us to effect settlement.

You may eliminate the possibility of additional trouble and make further communication unnecessary by contacting your creditor at once. Be sure to enclose this letter with your payment for proper identification.

On November 24, 1995, approximately 24 days after the first standard letter and eleven days after the second letter, Transworld sent a third letter to Jenkins:

Above claim still due. Federally mandated dispute period will expire within 10 days. Unless we hear from you, at that time we will assume your debt to be legally due.

Please be advised that there are two ways of settling a legitimate debt—timely payment or as the result of protracted and unpleasant collection effort. At this time the choice is still yours.

Make further effort on our part unnecessary by making payment to [Jerry Montell Pontiac].

### D. Plaintiff Terrafino

On August 22, 1995, Transworld sent Terrafino an initial "intensive" collection letter, which sought to collect $150.40 allegedly owed to Glenoaks Medical Center.[4] Transworld sent Terrafino a second letter dated September 5, 1995 and a third dated October 3, 1995.

The August 22 letter read:

URGENT—This account has been assigned to our agency for immediate collection.

Please be advised that we have been authorized to pursue collection and are committed to make whatever efforts are necessary and proper to effect collection.

Strongly recommend you contact our client to make payment arrangement.

This letter also included the required validation notice in the same language, print size and location as the first Jenkins letter. On September 5, 1995, Transworld sent Terrafino the same second form letter that it sent to Jenkins.

Transworld sent Terrafino a third, more detailed letter on October 3:

As Collection Manager of Transworld Systems Inc., I thought it important to state our intentions regarding your debt. The economic feasibility of some type of litigation by our client has not been determined.

---

4. The pleadings do not explain what gave rise to Terrafino's dispute with Glenoaks Medical Center.

However, please understand that if legal action were to be undertaken, it would be costly and time-consuming for both parties. The loser of such an action would probably be subject to court costs and/or attorney fees, if applicable. Should such court action occur, and should your creditor prevail, there would be available various avenues to satisfy a judgment. You may wish to check your state laws concerning these remedies.

It is not my intention to threaten or alarm you about this matter but merely to point out the problems of refusing to pay what appears to be a just and legal debt.

We would hope, however, that additional costly collection efforts not be necessary (sic) and that you demonstrate your willingness to resolve this matter by remitting the full amount due to [Glenoaks Medical Center].

On the reverse side of every form letter that Transworld mailed to both plaintiffs appear four numbered paragraphs that contain information required by various state debt collection statutes. Pl.'s Facts ¶ 22. Paragraph 3 reads in pertinent part:

### COLORADO

If you refuse to voluntarily pay this debt, or you wish our agency to cease communication either written or oral at either your place of employment or residence, and you so advise Transworld Systems Inc. in writing, we will not communicate with you further . . . .

This paragraph, which Transworld includes in letters mailed to debtors in several states, describes rights that Colorado law bestows on its residents. The FDCPA extends to all consumers the same right to request a debt collector to cease contact, but Transworld's letter mentions nothing about this federal right. Pl.'s Facts ¶¶ 23–24.

We must decide whether the undisputed facts demonstrate that these letters violate the FDCPA. First, however, we examine the legal standards applicable to this case.

### LEGAL STANDARDS

**A. Summary Judgment**

Summary judgment may be granted when the record contains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial will be found only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court ruling on a motion for summary judgment must view all evidence in a light most favorable to the nonmoving party, and draw all inferences in the nonmovant's favor. *Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir. 1996); *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir.1995). If the evidence is merely colorable, however, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 259–60; *Unterreiner v. Volkswagen, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993).

In determining whether a genuine issue exists, the court views the evidence presented "through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254. "If the record taken as a whole could not lead a trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. The judge will not engage in credibility determinations or weigh evidence, as these are functions of the jury. *Liberty Lobby,* 477 U.S. at 255.

Where the parties submit cross-motions for summary judgment, the court is not obligated to grant judgment as a matter of law for one side or another. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993). The court must evaluate each party's motion on its own merits, resolving all factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993). With these standards in mind, we examine the parties' cross-motions for summary judgment.

## B. FDCPA Claims

Congress enacted the FDCPA in 1977 "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). To this end, the Act sets certain standards for debt collectors' communications with debtors. Among them are a requirement that debt collectors advise debtors of their rights to dispute the debt and demand verification, *see* 15 U.S.C. § 1692g, a ban on false and misleading statements in collection letters, *see id.* § 1692(e), and a prohibition against collecting a debt through "unfair or unconscionable means," such as slapping the debtor with unauthorized fees beyond the amount in arrears, *see id.* § 1692f(1).

The Seventh Circuit evaluates communications from debt collectors "through the eyes of an unsophisticated consumer." *Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 483–84 (7th Cir.1997); *see Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir.1996). The unsophisticated consumer is a "hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading."[5] *Gammon v. GC Servs. Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir.1994). This presumes a level of sophistication that "is low, close to the bottom of the sophistication meter," *Avila*, 84 F.3d at 226, and "protects the consumer who is uninformed, naive, or trusting," *Jang*, 122 F.3d at 483–84 (quoting *Gammon*, 27 F.3d at 1257). Still, the standard "admits an objective element of reasonableness," which "protects debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Id.* (citation and internal quotations omitted).

The Court must determine whether Transworld's standard debt collection letters violate the consumer protection provisions in FDCPA §§ 1692g, 1692e, and 1692f, and, if so, whether Union can be held liable for any of these violations. Jenkins and Terrafino first contend that the standard form letters violate section 1692g because they overshadowed the validation notice at the bottom of the first letter. The notice was allegedly overshadowed not only visually, by the larger typeface in the initial letters' main text, but also linguistically, with requests for "immediate payment" and by later letters warning the plaintiffs that their "grace period" and "federally mandated dispute period" had nearly expired. Coupled with the statement that the debts "appear[] legally due and owing by you" and a suggestion to contact the creditors "at once," plaintiffs claim that the unsophisticated consumer would be confused into waiving his rights to dispute and verify the debts out of fear that waiting thirty days would only make things worse. The plaintiffs also claim that the letters violate section 1692g by directing the debtor to contact the creditor by phone.[6]

Second, Terrafino argues that his third letter's reference to litigation violated section 1692e(5), which prohibits "[a] threat to take any action that cannot legally be taken or that is not intended to be taken." Third, both plaintiffs urge that all the letters should have explained their FDCPA rights to request Transworld to stop contacting them. Including only the Colorado provision on this point allegedly misleads the non-Colorado-resident consumers to believe that they have no right to cease communications—in violation of section 1692e's false and misleading statement ban and 1692f's proscription of "unfair and unconscionable" collection endeavors. Finally, Jenkins maintains that Transworld's attempts to secure an allegedly unauthorized service fee from her was an "unfair and unconscionable" collection method under section 1692f, and misrepresented

---

5. Although numerous other circuits employ a "least sophisticated" consumer or debtor standard, the Seventh Circuit has adopted the "unsophisticated" consumer standard to "relieve incongruity between what the [least sophisticated consumer] standard would entail if read literally, and the way courts have interpreted the standard." *See Gammon*, 27 F.3d at 1257. While the least sophisticated consumer is, literally, the "single most unsophisticated consumer who exists," circuits that use this standard nevertheless "routinely blend in the element of reasonableness." *Id.*

6. The defendants argue that the plaintiffs' summary judgment motion cites numerous examples of overshadowing not included in the original complaint. The Court nevertheless considers these overshadowing charges since they are reasonably within the scope of the original allegations.

the amount of the debt in violation of section 1692e.

## ANALYSIS

### I. Claims of Overshadowing and Misrepresenting the Validation Period Under Sections 1692g and 1692e

To ensure that consumers have a fair chance to dispute and demand verification of their debts, Congress passed 15 U.S.C. § 1692g, which requires the debt collector to send the debtor a "validation notice" within five days of the collector's initial communication. The validation notice must explain that the debtor has 30 days to dispute the validity of all or a portion of the debt. *Id.* § 1692g(a)(4). If the debtor disputes the debt, the collector must cease collection efforts until it sends information verifying the debt. *Id.* § 1692g(b). If the debtor does not dispute the debt, the collector may assume it is valid. *Id.* § 1692g(a)(3).

■ A validation notice that explains the debtor's rights to contest a debt nevertheless violates section 1692g if the notice is somehow overshadowed or otherwise contradicted by accompanying or subsequent messages. *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 518 (7th Cir.1997). For example, in *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996), the Seventh Circuit held that following a validation notice with a threat to sue and the statement "if the above does not apply to you, we shall expect payment . . . within ten (10) days" violated 1692g. The *Avila* court explained that "[a] debt validation notice, to be valid, must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message." *Id.* The court found the letter did just that because it left the debtor without "a clue as to what he was supposed to do before real trouble begins." *Id.* While *Avila* adjudged overshadowing from an express threat, subsequent Seventh Circuit decisions indicate that an express threat is not

essential to an overshadowing claim, *see Chauncey*, 118 F.3d at 519 (7th Cir.1997) (a collection letter informing a debtor that failure to pay in full within 30 days could lead to "a decision to pursue other avenues to collect the debt" violated 1692g), and has espoused a consumer "confusion" standard instead,[7] *see Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir.1997).

In *Bartlett*, the court broadly stated that the "unsophisticated consumer is to be protected against confusion, whatever form it takes." *Id.* Plaintiff Bartlett's collection letter contained the standard validation notice informing him about his thirty-day right to dispute and demand verification of the debt, but added directly below the notice that "suit may be commenced at any time before the expiration of this thirty (30) days." *Id.* While noting that § 1692g does not prohibit a debt collector from threatening litigation or even instituting a lawsuit before the validation period expires, the court held that the collector must adequately explain how its right to seek collection or file suit coexists with the debtor's validation rights. *Id.* If the debtor is left unable to determine how those rights "fit together," the letter violates the FDCPA. *Id.* That was the case with the letter to Bartlett; the threat to sue if payment was not made within one week—while simultaneously informing Bartlett of his thirty-day validation rights—"turned the required disclosure into legal gibberish." *Id.* at 501. The Seventh Circuit reversed the district court's judgment for the collector and remanded the case for entry of judgment in favor of the plaintiff. *Id.* at 502.

In this case, plaintiffs Jenkins and Terrafino claim numerous section 1692g violations based on the various letters they received from Transworld. We review each alleged transgression separately.

---

7. Other circuits likewise hold that the offending letter need not contain an overt threat, but may violate section 1692g with an implied threat, *see Russell v. Equifax*, 74 F.3d 30, 34 (2d Cir.1996) (letter's statements that, "[i]f you do not dispute this claim (see reverse side) and wish to pay it within the next 10 days we will not post this collection to your file" and "[i]t is our practice to post unpaid collections in the amount of $25 or

more to individual credit records," overshadowed debtor's thirty-day right to dispute the debt); or, in the absence of an implied threat, confusing language, *see Miller v. Payco–General American Credits, Inc.*, 943 F.2d 482, 484 (4th Cir.1991) (letter demanding "immediate full payment" and instructing the consumer to telephone the creditor "now" could confuse the debtor into giving up his or her validation rights).

## A. Visual Overshadowing in the Plaintiffs' First Letters

■ We first address plaintiffs' claim that the visual presentation in their initial letters from Transworld overshadowed their rights to dispute and verify their debts. Specifically, plaintiffs claim that their section 1692g rights were obscured because the validation notice was printed in a smaller typeface than the letter's main text. *See Bartlett,* 128 F.3d at 500 ("The required notice might be 'overshadowed' just because it was in smaller or fainter print than the demand for payment.").

■ We disagree that the type size is overshadowing in this case. The validation notice need only "be large enough to be easily read and sufficiently prominent to be noticed" by an unsophisticated consumer. *Severson v. Transworld Sys., Inc.,* 1994 WL 779763, at *2 (W.D.Wis. Apr.12, 1994). Transworld printed the validation notice on the front of these letters in an italicized style that makes the notice easy to distinguish and to locate. While the type size in the notice is smaller than the printing in the body of the letter, it is large enough to read easily. Moreover, except for using capital letters in the words "SPECIAL NOTICE" at the top of Jenkins' letter and the single word "URGENT" at the head of Terrafino's letter, Transworld employs a consistent, standard, typeface in the body of the letter. Transworld has not, for example, printed the validation notice in light, barely legible ink, juxtaposed the notice against screaming headlines, or employed any of the visual devices that other courts have found to overshadow the validation notice. *See United States v. National Fin. Servs., Inc.,* 98 F.3d 131, 139 (4th Cir.1996) (validation notice overshadowed where "bold commanding type of the dunning text overshadowed the smaller, less visible, validation notice printed on the back in small type and light grey ink."); *Swanson v. Southern Oregon Credit Serv., Inc.,* 869 F.2d 1222, 1225–26 (9th Cir. 1988) (section 1692g violated where notice at the bottom of the page in ordinary typeface was "dwarfed by a bold-faced, underlined message three times [its] size which dominates the center of the page").

Indeed, two other courts have rejected this exact claim lodged against the very same Transworld form letters. *See Severson,* 1994 WL 779763, at *2 ("Applying this standard to the letters at issue it is clear that there is no violation of the Act. The notices appear at the bottom of the single-page letters which were sent to the debtors. The notices are plainly legible and would no doubt be observed even by the least sophisticated debtor."); *Anthes v. Transworld Sys., Inc.,* 765 F.Supp. 162, 169 (D.Del.1991) ("In the present case, there is no issue of material fact with respect to this claim.... The notices are clear and readable, and should be noticed by even the least sophisticated of debtors."). Accordingly, plaintiffs cannot obtain summary judgment on this ground. Because the initial letters are not, as a matter of law, visually overshadowing, defendants win summary judgment on this issue.

## B. Overshadowing Claims Arising from Jenkins' First Letter

■ Next, Jenkins claims that the language in her initial letter, which Transworld sent November 1, 1995, contradicts and overshadows the validation notice because it requests that she "immediately make payment." Specifically, the last sentence implores Jenkins, "To avoid any possible misunderstanding, it is important you immediately make payment to or arrangements with [Jerry Montell Pontiac]." Analyzing the letter's language under the confusion-based standard articulated in *Bartlett v. Heibl,* 128 F.3d 497 (7th Cir.1997), we find it violates § 1692g.

By asking Jenkins to "immediately make payment to or arrangements with" the creditor, while simultaneously granting him thirty days to challenge the validity of the debt—yet failing to state which provision takes precedence—the letter presents two apparently contradictory statements without explaining their relationship. *See Bartlett v. Heibl,* 128 F.3d 497, 500 (7th Cir.1997) ("These rights are not inconsistent, but by failing to explain how they fit together the letter confuses"). The directive that "it is important" to "immediately" pay or make arrangements with the creditor leaves the impression that the consumer must pay or begin paying right away, and that he has no right to contest the debt or demand verifica-

tion first. The Seventh Circuit has found even less urgent demands for payment to overshadow the validation notice. *See Avila*, 84 F.3d at 226 (letter demanding payment within 10 days violated FDCPA); *Chauncey*, 118 F.3d at 519 (letter requesting payment within 30 days violated § 1692g). When viewed through the eyes of an unsophisticated consumer, this kind of unexplained contradiction is sufficiently confusing to violate § 1692g.

The Court rejects Transworld's argument that the letter is simply communicating a desire for prompt contact or prompt payment. The fact is that the letter stresses the "importan[ce]" of making *"immediate payment* to or arrangements with" the creditor. (emphasis added). The problem lies in the close proximity of the words "immediate" and "payment." These words are easily interpreted as requesting the consumer to pay or set up a payment plan, not simply make contact—and to start paying now, rather than exercise the consumer's thirty-day rights to dispute or verify the debt. This request for immediate payment distinguishes the communication found permissible in *Gammon v. Belzer*, 1997 WL 189291 (N.D.Ill. Apr.11, 1997). In *Gammon*, the letter stated that "[y]our immediate attention to this matter is in your best interest;" it never asked for payment immediately or within any time period under thirty days. *Id.* at *2. As the court in *Gammon* correctly held in dismissing the 1692g claim with prejudice, this sentence was merely a recommendation that the plaintiff "look into the matter as soon as possible." *Id.* at *3. *See also Vasquez v. Gertler & Gertler, Ltd.*, 987 F.Supp. 652, 657 (N.D.Ill.1997) ("While a demand for immediate payment may overshadow a validation notice, the letter does not demand payment immediately or within any time period less than thirty days. Rather, the letter asks for Vasquez's immediate attention, a request that has never been found to violate section 1692g").

■ Nor must the payment directive be accompanied by a threat to constitute overshadowing. *See Chauncey*, 118 F.3d at 518; *see also Russell v. Equifax*, 74 F.3d 30, 35 (2d Cir.1996) ("The question is whether ... the notice overshadowed or contradicted the mandatory validation notice; if so, then the

Act is violated. It is unnecessary to prove the contradiction is threatening."). As *Bartlett* made clear, our job is to discern whether the request for immediate payment gives rise to confusion. 128 F.3d at 500. We find as a matter of law that the November 1, 1995 letter's emphasis on immediate payment or arrangements presented an apparent contradiction to Jenkins' validation rights, and leaves no doubt that an unsophisticated debtor would be confused. Therefore, we grant summary judgment to Jenkins on her overshadowing claim based on the language in her November 1, 1995 dunning letter. We deny defendants' motion for summary judgment on this ground.

## C. Overshadowing Claims Arising from Terrafino's First Letter

■ Terrafino likewise challenges the legality of his initial dunning letter, dated August 22, 1995. Although this letter does not use the words "immediate payment," we conclude that, viewed as a whole, the letter creates an apparent and unexplained contradiction between its message and the thirty-day validation rights discussed at the bottom of the letter.

The letter begins with the declaration "URGENT." This is followed by a statement informing Terrafino that his account has been "assigned to our agency for immediate collection." Contrary to Transworld's assertions, the unsophisticated consumer is likely to understand "immediate collection" as an effort to extract immediate payment from him, not as a reference to the collector's duties. While *Bartlett* makes clear that a debt collector need not suspend collection efforts during the validation period, these efforts run afoul of the FDCPA if they create an unexplained contradiction that confuses the debtor. 128 F.3d at 500. The confusion in this letter is compounded by its last sentence, which "[s]trongly recommend[s] you contact our client to make payment arrangement." Read together, the reference to "immediate collection" and the "strong" recommendation to contact the creditor to arrange for payment are the substantive equivalent of the request for immediate payment in Jenkins' first letter.

A collection letter that does not expressly request immediate payment can also overshadow the validation notice by creating a confusing impression of urgency, when, in reality, the consumer has thirty days in which to decide on his course of action. *See Ozkaya v. Telecheck Servs., Inc.*, 982 F.Supp. 578, 583–84 (N.D.Ill.1997) (plaintiff stated valid overshadowing claim where offending letter was confusing because it "urg[ed] [plaintiff] to resolve the dispute 'quickly' when, in fact, she had at least thirty days."). Terrafino's letter begins by proclaiming that it is "URGENT;" the sense of urgency is further communicated by the "immediate collection" language and in the letter's express request for action—a "strong" recommendation in the final paragraph that Terrafino contact the creditor to make payment arrangements. The middle paragraph sounds pressing and ominous as well: "Please be advised that we have been authorized to pursue collection and are committed to make whatever efforts are necessary and proper to effect collection." We find that this language creates an apparent contradiction with the validation notice by creating a false sense of urgency.

Accordingly, we grant Terrafino summary judgment on his overshadowing claim premised on the language in his first letter, and deny defendants' cross motion for summary judgment on this claim. We emphasize, however, that our decision to grant Terrafino summary judgment on this ground is based on the letter read as a whole, not on any one phrase scrutinized in isolation.

### D. Overshadowing Claims Arising from the Common Second Letter

Plaintiffs next contend that Transworld's second letter, sent in identical form to Terrafino on September 5, 1995 and to Jenkins on November 15, 1995, overshadowed and contradicted the validation notice in the initial letters to the plaintiffs. *See Chauncey*, 118 F.3d at 518 (subsequent letters violate section 1692g if they overshadow or contradict the validation notice in an earlier communication). Plaintiffs argue that the second letters are overshadowing in two ways: (1) Despite the fact that these letters were sent with fourteen days remaining in the validation period, they confuse the unso-

phisticated consumer into believing he must act earlier by announcing, "IMPERATIVE—Grace period about to expire," and "you may eliminate the possibility of additional trouble and make further communication unnecessary by contacting your creditor at once;" and (2) The letters' statement that the debts "appear[] legally due and owing by you" confuse the unsophisticated consumer into thinking that he has no legal basis for disputing them.

We disagree that these statements are overshadowing under *Bartlett*'s confusion standard. The reference to an expiring "grace period" and suggestion to contact the creditor "at once" neither directly nor apparently contradict the consumer's thirty-day right to dispute the debt. These statements do not demand payment—or any other action, for that matter—immediately or within a certain time frame, *see Chauncey*, 118 F.3d at 518; they simply suggest a possible course of action—communication. *See Vasquez*, 987 F.Supp. at 657 (letter requesting debtor's "immediate attention and cooperation by sending me your payment or contacting me without further delay" simply provides the debtor with two possible courses of action, and complies with section 1692g as a matter of law). They do not create a false sense of urgency, *see Ozkaya*, 982 F.Supp. at 584 (letter stated valid overshadowing claim because it proclaimed, "[W]e have entered your name in our NATIONAL COMPUTER FILES. Until this is resolved, we may not approve your checks or the opening of a checking account at over 90,000 merchants and banks . . . ."), and do not threaten legal action, *see Avila*, 84 F.3d at 226, or impliedly threaten the consumer's credit rating, *see Russell*, 74 F.3d at 34.

Most important, these statements are not confusing. The expiring "grace period" is perfectly compatible with the passing thirty-day validation period; even the unsophisticated consumer needs no explanation as to how these two seemingly interchangeable concepts fit together. Nor could the grace period statement confuse the unsophisticated consumer about the time remaining in the validation period because it does not purport to specify how much time the consumer has left to challenge the debt. Likewise, sug-

gesting that the consumer contact the creditor "at once" to avoid possible trouble or further collection correspondence is consistent with the waning validation period. This statement, in conjunction with the grace period language, is reasonably read as a reminder to the consumer that he has a limited time period in which to act, and that it is in his best interest to move in a timely fashion.[8] Far from persuading the consumer to forego his rights, this letter may actually prompt the consumer to enforce them.

Equally infirm is the plaintiffs' contention that telling the unsophisticated consumer his debt "appears legally due and owing" would lead him to conclude that he lacks a legal basis to contest it. Placing the word "appears" before "legally due and owing" communicates uncertainty; indeed, it invites a challenge to the statement's accuracy. As such, this language adequately conveys that the debt's validity is not a foregone conclusion.[9]

In sum, Transworld's second letters to Jenkins and Terrafino cannot reasonably be read to confuse consumers about their validation rights. Therefore, plaintiffs are not entitled to summary judgment on this ground. Because no unsophisticated consumer could be confused by these letters as a matter of law, we grant defendants summary judgment on this issue.

### E. Overshadowing Claims Arising from Jenkins' Third Letter

■ Jenkins argues that her third letter, sent November 24, 1995, also contains language that overshadowed the validation notice in his initial letter.[10] Sent 24 days after the first communication, the letter proclaims, "Above claim still due. Federally mandated dispute period will expire within 10 days." It further advises that "there are two ways of settling a legitimate debt—timely payment or as the result of protracted and unpleasant collection effort. At this time the choice is still yours." Jenkins does not explain exactly how this language violates section 1692g, other than characterizing the letter as "demanding 'timely payment' or face 'protracted and unpleasant collection effort[s].'" Pl.'s Mot. Partial S.J. at 12. Presumably, Jenkins objects as well to the "federally mandated dispute period" expiration language on the same grounds as the expiring "grace period" statement.

We find no basis for an overshadowing claim in Jenkins' third letter. First, just like the "grace period" language in Transworld's second letter, alerting Jenkins that the federally mandated dispute period will expire within 10 days merely reminds Jenkins about her validation rights. Second, Jenkins' characterization of the letter's remaining language is a gross misrepresentation. The letter never "demands" timely payment; it simply explains that a *valid* debt must either be paid on time or collected—after reminding Jenkins that she still has time to dispute the debt's validity. The warning about protracted and unpleasant collection efforts does not directly or apparently contradict Jenkins' thirty day validation rights either. It in-

**8.** The "grace period" language distinguishes Transworld's second letter from the communication in a recent decision, *Flowers v. Accelerated Bureau of Collections, Inc.,* 1997 WL 136313 (N.D.Ill. Mar.19, 1997), *modified on reconsideration,* 1997 WL 224987 (N.D.Ill. Apr.30, 1997). The *Flowers* court held, on reconsideration, that a follow-up collection letter urging immediate communication—but not payment—nevertheless stated a valid section 1692g claim because it omitted a reminder about the thirty day dispute period. 1997 WL 224987, at *3. This created the potential for confusion because, without the reminder, the request for immediate contact suggested to the unsophisticated consumer that the validation period had expired. *Id.*

**9.** For the same reason, this statement is not a "false, deceptive, or misleading" means of debt collection proscribed by section 1692e, nor an

"unfair or unconscionable" means of debt collection in violation of section 1692f.

**10.** The defendants argue that Jenkins waived any 1692g claims based on her third letter because they were not properly pled in the complaint. They point out that Count I (which sets forth the plaintiffs' section 1692g claims) says nothing about this letter. Although defendants are correct that the third letter is not expressly mentioned in Count I, the complaint references the letter in earlier paragraphs, all of which Count I incorporates by reference. Moreover, the plaintiffs' opening brief includes enough facts (though just barely enough) to fairly alert the defendants about the basis for this claim. Finally, since we conclude that this claim fails as a matter of law, defendants are not prejudiced by its consideration.

forms Jenkins that, if her debt is valid and remains unpaid, efforts will be made to collect the debt—efforts that may be protracted and unpleasant. All of this is true, and serves to encourage, not discourage, the seasonable exercise of validation rights. Because the letter would not confuse the unsophisticated consumer about her validation rights, we deny Jenkins summary judgment on her 1692g claim based on the November 24, 1995 letter, and grant the defendants summary judgment on this claim.

### F. Misrepresenting the Thirty Day Validation Period—Section 1692e Claims Arising from the Common Second Letter and Jenkins' Third Letter

We next address issues closely related to the plaintiffs' overshadowing claims based on the expiring "grace period" language in Transworld's second form letter and the "federally mandated dispute period" expiration statement in Jenkins' third letter. Plaintiffs urge that, in addition to overshadowing the validation notice in violation of section 1692g, these statements are "false, deceptive, or misleading means" of debt collection under section 1692e because they misrepresent the time remaining in the validation period. According to plaintiffs, the second letters were sent only fifteen days after the validation period began, but the phrase "grace period about to expire" falsely implies that far less time remains. Jenkins' third letter, on the other hand, allegedly falsely overstates the time left in the validation period: although sent twenty-four days into the thirty-day period, the letter declares "federally mandated dispute period will expire within 10 days" instead of six.

The first claim has no merit. The second involves fact issues preventing summary judgment for both sides.

We reject the assertion that "grace period about to expire" falsely or misleadingly understates the amount of time left in the validation period. This language never specifies the time remaining in the period. The plaintiffs need only have looked to their initial letters to calculate how much time remained to dispute their debts. The FDCPA does not impose contract-like precision on debt collection letters; it prohibits false, misleading or deceptive statements. Read in context with the initial letters, we cannot reasonably conclude that the "about to expire" language is false or misleading. As for the plaintiffs' objection to the statement "federally mandated dispute period expires within 10 days" in Jenkins' third letter, it is premised on a fundamental misreading of the FDCPA. The statute permits the exercise of validation rights "within thirty days after *receipt* of the notice," *see* § 1692g(a)(3), not thirty days after the notice is sent. We cannot tell when Jenkins received the validation notice contained in her initial letter because the record contains no evidence on this point. This makes it impossible to determine whether the third letter's ten-day statement left a false or misleading impression about the time remaining in Jenkins' validation period, creating an issue of material fact.

To recap, on the 1692e claim tied to Transworld's second form letter, we deny summary judgment to the plaintiffs and grant summary judgment to the defendants. We deny summary judgment to both sides on the issue of whether Jenkins' third letter violates section 1692e.

### G. Section 1692g Claim Arising from the Alleged Direction to Contact the Creditor By Telephone

Plaintiffs lodge one final 1692g attack on Transworld's letters. They claim that the "series" of letters violates 1692g by inviting the plaintiffs to telephone their creditors. While the FDCPA does not explicitly prohibit a request for phone contact, some courts have held that asking for a phone call overshadows the validation notice because the FDCPA requires the debtor to dispute the debt in writing. In *Miller v. Payco–General American Credits, Inc.*, 943 F.2d 482, 484 (4th Cir.1991), for example, the court observed that "a consumer who wished to obtain validation of his debt could lose his rights under the statute if he followed the commands to telephone [because ...] collection activities will cease only when the consumer disputes the debt in writing." But the Ninth Circuit disagrees. In *Terran v. Kaplan*, 109 F.3d 1428, 1434 (9th Cir.1997), the

court held that requesting the debtor immediately to telephone the collector does not contradict the validation notice. "This language simply encourages the debtor to communicate with the debt collection agency. It does not threaten or encourage the least sophisticated debtor to waive his statutory right to challenge the validity of the debt." *Id.*

██ The court need not choose sides on this split in authority because none of Transworld's letters asks the consumer to telephone the creditor. Not once does Transworld use the words "phone," "call," or imply that contact should be oral rather than written. Instructions to "contact our client" in Terrafino's first letter are reasonably interpreted, even by an unsophisticated consumer, to mean written contact. Directions to "contact[] your creditor at once" in the plaintiffs' second letters are clarified by the language "[b]e sure to enclose this letter with your payment for proper identification." Read together, these statements request contact by mail, not by telephone. Therefore, defendants, not plaintiffs, are entitled to summary judgment on this issue.

## II. The 1692e(5) Claim—Threat of Suit in Terrafino's Third Letter

The FDCPA has a special section aimed at preventing empty threats of litigation as a means of scaring the debtor into payment. Section 1692e prohibits a debt collector from using any "false, deceptive or misleading representation or means in connection with the collection of any debt, including but not limited to ... (5) the threat to take any action that cannot legally be taken or that is not intended to be taken." Terrafino claims that Transworld violated § 1692e(5) by threatening him with legal action that neither it nor the creditor intended to initiate. He points to the following language in his third letter from Transworld, dated October 3, 1995:

> The economic feasibility of some type of litigation by our client has not been determined.
>
> However, please understand that if legal action were to be undertaken, it would be costly and time-consuming for both parties. The loser of such an action would probably be subject to court costs and/or attorney fees, if applicable. Should such court ac-

tion occur, and should your creditor prevail, there would be available various avenues to satisfy a judgment. You may wish to check your state laws concerning these remedies.

> It is not my intention to threaten or alarm you about this matter but merely to point out the problems of refusing to pay what appears to be a just and legal debt.

This language, Terrafino claims, would lead an unsophisticated consumer to believe Transworld was threatening legal action to collect the $150 debt unless it was paid. But this is misleading, according to Terrafino, because (1) Transworld knew that it was not economically feasible to sue over such a small amount, and (2) Terrafino's account was still in "Phase I" of Transworld's collection program, which is limited to sending correspondence. Transworld counters that Terrafino fails the threshold requirement that the letter make a "threat" to take action. While the letter mentions the word "litigation," Transworld argues, the surrounding language makes clear that no action is pending and no decision has been made regarding any future action.

██ Tracking the terms of the statute, we begin by asking whether this letter poses a "threat to take [legal] action," as viewed through the eyes of the unsophisticated consumer. *See United States v. National Financial Servs., Inc.*, 98 F.3d 131, 136 (4th Cir.1996) (evaluating letters from the consumer's point of view "is consistent with the norms that courts have traditionally applied in consumer-protection law."). For a collection letter to threaten legal action under § 1692e(5), it must communicate that a lawsuit is not merely a possibility, but that a decision to pursue legal action is either imminent or has already been made. Courts have found litigation threats even in indirect or oblique statements, provided that they imply legal action is underway or contemplated in the near future.

For instance, in *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 25–26 (2d Cir.1989), the court found an implied threat to take legal action in the following statements: "Notice Is Hereby Given That This Item Has Already Been Referred For Collec-

tion Action"; "We Will At Any Time After 48 Hours Take Action As Necessary And Appropriate To Secure Payment In Full"; and "Pay This Amount If Action Is To Be Stopped." While acknowledging that the question was close, the court determined, "The clear import of the language, taken as a whole, is that [some] type of legal action has already been or is about to be initiated and can be averted from running its course only by payment."

*Bentley v. Great Lakes Collection Bureau, Inc.*, 6 F.3d 60, 62–63 (2d Cir.1993), went one step further, finding an implied threat of litigation even though a later letter denied that legal action was underway. The collector mailed two letters to the debtor. The first informed the debtor that "our client has instructed us to proceed with whatever legal means is necessary to enforce collection." *Id.* at 61. The follow-up letter stated, in part, "[Y]our delinquent account has been referred to my desk where a decision must be made as to what direction must be taken to enforce collection. Were our client to retain legal counsel in your area, and it was determined that suit should be filed against you, it could result in a judgment." *Id.* Although the second letter concluded with the statement "No legal action has been or is now being taken against you," the Second Circuit held that this did not save the first letter's statement that the collection agency was authorized to bring legal action, or the second letter's pronouncement that "a decision must be made as to what direction must be taken to enforce collection." Read together, the letters could lead the unsophisticated consumer to think that legal proceedings were imminent. *Id.* at 62.

Consistent with this focus on imminence, some courts have refused to find a threat of litigation even in the face of stronger, more direct references to "legal action," when the letter does not suggest that the action is already underway or imminent. These cases deem permissible statements that litigation is an option that the creditor can consider. For example, in *Madonna v. Academy Collection Serv., Inc.*, 1997 WL 530101, at *6–*7 (D.Conn. Aug.12, 1997), the debt collector sent three letters that all informed the debtor, "Our client may choose to pursue legal action." *Id.* at *1–*2. The last letter pre-

ceded this statement with the declaration that "it is our intent to close our files and inform our client that you have refused to cooperate." *Id.* at *2. The letter went on to describe possible consequences of litigation and suggested that the client obtain legal assistance. *Id.* The court held, however, that the letters' references to legal action were not threats to pursue it—the letters merely communicated that litigation was one possible course of action. "Far from threatening legal action, the statement ... indicates that legal action is an option available to the creditor, who may indeed choose to take advantage of it." *Id.* at *7. *See also Knowles v. Credit Bureau of Rochester*, 1992 WL 131107, at *1–*2 (W.D.N.Y. May 28, 1992) (the statement "failure to pay will leave our client with no choice but to consider legal action" did not violate section 1692e by threatening legal action: "At most, the language at issue here threatened that the creditor will have to consider legal action. No action of any kind is threatened by defendant collection agency.").

 Finally, in cases where the likelihood of legal action is not clear from the language, the letter's source can be determinative, especially if it purports to be from an attorney. "Because to most consumers, the relevant distinction between a collection agency and an attorney is the ability to sue," a letter signed by an attorney signals to the unsophisticated consumer that legal action is at hand. *United States v. National Fin. Servs.*, 98 F.3d 131, 136–37 (4th Cir.1996); *see also Russey v. Rankin*, 911 F.Supp. 1449, 1454 (D.N.M.1995) (a letter purporting to be from an attorney declaring "we have the legal right to file a lawsuit" held to "clearly threaten litigation.").

 Our review of the relevant legal precedent leads us to conclude that Terrafino's October 3, 1995 letter does not impermissibly threaten litigation in violation of 1692e(5). First, the letter is clearly not from an attorney; it is signed by Transworld's collection manager and written on Transworld's letterhead. Second, the letter's reference to litigation lacks imminence; it contains no language implying that legal action is underway, either now or in the near future. The para-

graph discussing litigation is phrased in hypothetical terms, such as "if legal action were taken" and "should such court action occur." In fact, the sentences following these phrases state explicitly that "[i]t is not my intention to threaten you about this matter . . . ." Most important, the letter opens by disavowing any current or imminent legal action; the first sentence states that "the economic feasibility of some type of litigation by our client has not been determined." In short, the letter makes clear that no decision regarding legal action has been made, no action has been taken and none is imminent. It is a lawful reminder that litigation is a step available in the debt collection process, and details some of the possible consequences of that step. Because we find no threat in the October 3, 1995 letter, we need not consider whether Transworld had the intent or authority to follow through with legal action. We grant summary judgment on this issue to the defendant, and deny it to Terrafino.

### III. The 1692e and 1692f Claims Arising from Disclosures on the Back of Transworld's Letters

 Plaintiffs next take issue with the contents of—or rather, omissions from—the reverse side of Transworld's dunning letters. On the back of each letter that Transworld sent the plaintiffs are selected state collec-

tion law provisions. One paragraph under the heading "COLORADO" explains that the state's law prohibits a debt collector from contacting the debtor at home or work if the debtor requests cessation of contact.[11] Plaintiffs claim that this notice is misleading under 15 U.S.C. § 1692e, as well as unfair and unconscionable under § 1692f, because it is not printed in conjunction with the FDCPA's analogous provisions. *See* 15 U.S.C. § 1692c(c).[12] Printing these consumer protections only under the "Colorado" heading, plaintiffs argue, deceives the debtor into believing that only Colorado residents are entitled to end collection agency contact when, in fact, this right is extended to all consumers, regardless of their residence, under the FDCPA.

The Colorado and federal statutes differ in an important way, however. Colorado law requires collection agencies to notify Colorado consumers about these cessation rights, in writing, along with their initial collection communications. *See* Colorado Rev. Stat. § 12–14–105(3)(c). The FDCPA, on the other hand, does not require debt collectors to disclose the analogous federal rights in any debt collection letter.

The plaintiffs retort that the Colorado statute does not require this information to be accompanied by the "Colorado" heading. They argue this heading, which appears in

---

11. Colorado Rev. Stat. § 12–14–105(3) states:
 (a) If a consumer notifies a debt collector or collection agency in writing that:

 (II) The consumer refuses to pay a debt or the consumer wishes the collection agency to cease further communication with the consumer, then the debt collector or collection agency shall not communicate further with the consumer with respect to such debt except:
 (A) To advise the consumer that the collection agency's further efforts are being terminated;
 (B) To notify the consumer that the collection agency or creditor may invoke specified remedies which are ordinarily invoked by such collection agency or creditor; or
 (C) Where applicable, to notify the consumer that the collection agency or creditor intends to invoke a specified remedy permitted by law.
 (b) If such notice from the consumer is made by mail, notification shall be complete upon receipt.
 (c) In its initial written communication to the consumer, the collection agency shall include

notification of the consumer's rights under this subsection (3). If such notification is placed on the back of the written communication, there shall be a statement on the front notifying the consumer of such fact.

12. 15 U.S.C. § 1692c(c):

 Ceasing Communication—If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt except:
 (1) to advise the consumer that the debt collector's further efforts are being terminated;
 (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor;
 (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

letters sent across the country, misleads unsophisticated consumers from other states into believing that the right to end debt collection communications belongs exclusively to Colorado residents. Unaware of their parallel federal section 1692c(c) rights, these consumers will likely continue to receive unwanted contact. The plaintiffs go on to suggest a number of alternative ways that Transworld's letters could provide the information from both statutes.

Transworld responds that this Court should follow the ruling in *Brown v. ACB Business Servs., Inc.*, 1996 WL 469588, at *3 (S.D.N.Y. Aug.16, 1996), which rejected an identical section 1692e claim challenging the omission of section 1692c disclosures from letters that printed analogous state provisions. The *Brown* court admitted that consumers "could be misled as to the scope of his or her rights by the state disclosures" but explained that "this Court is constrained by the knowledge that Congress did not include in the FDCPA a mandatory notification provision with respect to the FDCPA itself." *Id.* at *3. Finding a violation under these circumstances would "in effect write a notification requirement into the FDCPA," exceeding the court's judicial power. *Id.* We agree with *Brown*'s observation that any ruling on this issue should not be fashioned in a way that constructively imposes a written federal notification requirement. But, we hasten to add, ruling that Transworld must communicate that cessation rights are not limited to Colorado residents does not necessarily mean that Transworld is required print the relevant federal statutory section.

In fact, we would leave the method of compliance up to Transworld.

It is within our purview to mandate that if Transworld prints state statutory provisions explaining debtors' rights to stop contact, as it must under Colorado law, and chooses to send these letters to debtors across the country, it must do so in a way that will not confuse those debtors into believing they have no similar rights because they reside outside of Colorado. We find that Transworld failed to meet that mandate in the letters it sent to plaintiffs. The unsophisticated consumer could read the notice on the back of Transworld's letters and be mislead to believe that only Colorado residents may demand that a debt collector cease communication.[13]

We conclude that Transworld has violated 1692(e)[14] by presenting information about debtors' rights to cease collector contact in a misleading manner. Therefore, we grant summary judgment to the plaintiff on this issue, and deny it to defendants.

## IV. Attempted Collection of Unauthorized Service Fee

We now consider the last of the alleged FDCPA violations—Jenkins' claim in Count II of the complaint that Transworld violated the FDCPA by attempting to collect a $25 service fee from her.[15] These allegations stem from events in October 1995 when, shortly after purchasing a car that proved to have mechanical problems, Jenkins stopped payment on her $1,000 check for the car's downpayment. That action prompted the car

13. Simply by way of suggestion, Transworld may want to consider prefacing the state law disclosures with the following statement suggested by the *Brown* court: "We are required under state law to notify consumers of the following rights. This list does not contain a complete list of the rights consumers have under state and federal law." 1996 WL 469588, at *3 n. 1.

14. Having found a section 1692e violation, we express no opinion as to whether this aspect of the letters offends section 1692f.

15. This FDCPA claim resides in Count II of the complaint. Count III alleges that Transworld's attempt to collect this service fee likewise violated the Illinois Collection Agency Act, 225 ILCS 425/2.02; however, the plaintiffs fail to argue or even mention this claim anywhere in their briefs.

The defendants also shy away from defending against the Illinois Act. Given the parties' utter failure to support or defend against Count III with legal argument and authority, we offer no opinion on the viability of this claim. *See Reidt v. County of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir.1992) (plaintiff waived disparate impact claim alleged in complaint because she did not fulfill her "minimal responsibility of identifying the applicable law and arguing why the facts ... fit into the parameters of that law."); *see also Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs*, 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is ... not developed [] in a party's brief.").

dealer to turn Jenkins' account over to Transworld for collection. In providing the information requested by Transworld's "Start Service" form, however, the dealer incorrectly indicated that Jenkins' check had been returned "NSF" (not sufficient funds). Accordingly, the dealer added a $25 NSF service fee to the $1,000 it sought to collect. This misinformation was reflected in the November 1, 1995 letter that Transworld sent to plaintiff Jenkins—a letter specifically designed for debts arising from a dishonored check.

Jenkins contends that Transworld's efforts to collect the $25 fee violate section 1692f(1), which prohibits the use of unfair or unconscionable means to collect a debt, including attempts to secure an amount not "expressly authorized by the agreement creating the debt or permitted by law." Jenkins also claims that this collection effort violates section 1692e(2)(A), which prohibits the false representation of "the character, amount, or legal status of any debt."

 "Federal courts look to state law in determining whether a fee is 'permitted by law' under 1692f(1)." *Ozkaya v. Telecheck Servs., Inc.,* 982 F.Supp. 578, 585 (N.D.Ill. 1997). While Illinois law permits assessing service fees for dishonored checks,[16] it does not allow service charges to be imposed on a stopped check. Nor does Transworld contend that any contract between Jenkins and the car dealer permitted tacking a service fee onto debts arising from a stopped check. Consequently, it appears that the service fee charge violates section 1692f(1). It appears to violate section 1692e(2)(A) as well, which prohibits the false representation of the debt's amount.

 This does not end the matter, however. It remains to be seen whether Transworld can be held liable for these violations. Civil liability under the FDCPA is governed by § 1692k, which allows recovery against a debt collector who intentionally violates the Act, but absolves a debt collector whose "violation was unintentional and occurred despite the existence of reasonable

procedures to prevent it." *Jenkins v. Heintz,* 124 F.3d 824, 828 (7th Cir.1997).[17] The section reads:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). The first question the *Jenkins* court examined is whether the statutory violation was intentional. On this score, the court explained that once a defendant offers evidence that it was unaware of the violation, the burden shifts to the plaintiff to show that the defendant was indeed acting intentionally. *Id.* at 831. To fulfill this burden, the plaintiff "is required to present evidence creating a reasonable inference, not a mere possibility" of intent. *Id.* Negligence is insufficient; the plaintiff may not show violations of sections 1692f and 1692e, for example, by demonstrating that the defendant should have known that the debt was unauthorized. The statute requires a reasonable inference that "defendants actually knew [that the debt amount was unauthorized], and then intentionally made a false representation." *Id.* at 832. After evaluating the intent issue, the court then determined whether the violation was the result of a bona fide error. *Id.; see* 15 U.S.C. § 1692k(c).

 Transworld offers evidence that it was unaware of its statutory violations, i.e., that the $25 service fee was not authorized at the time it sent the collection letter. It is undisputed that Transworld was not in possession of the sales contract between plaintiff Jenkins and the creditor. In fact, Transworld had no other information about Jenkins' debt aside from its "Start Service" form—on which the creditor incorrectly noted that Jenkins' debt arose from a dishonored check. The *Jenkins* court makes clear that a debt collector has the right to rely on information provided by the client-creditor,

---

16. 810 ILCS5/3–806 (1988).

17. The *Jenkins* court applied section 1692k's civil liability requirements to the plaintiffs' section 1692f(1) and section 1692e(2)(a) claims that the defendant was trying to collect unauthorized debts consisting of force-placed insurance premiums.

and has no obligation to undertake an independent debt validity investigation. *See* 124 F.3d at 833–34 (recognizing that neither attorneys acting as debt collectors nor non-lawyer debt collectors are required to "conduct an independent investigation into the legal intricacies of the client's contract with the consumer"); *see also Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1032 (6th Cir.1992); *Ducrest v. Alco Collections, Inc.*, 931 F.Supp. 459, 462 (M.D.La.1996); *Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383, 392–93 (D.Del.1991).

Jenkins, on the other hand, fails to present evidence from which a reasonable jury could infer that Transworld knew it was collecting an unauthorized fee. While the plaintiffs' response to Transworld's motion for summary judgment attaches a copy of Jenkins' check, stamped "payment stopped," Jenkins provides no evidence that Transworld ever saw the check, much less that it was in Transworld's possession at the time it received the creditor's erroneous "Start Service" form. Jenkins rejoins that, as an experienced debt collector, Transworld knew or should have known that the FDCPA prohibits collecting unauthorized service fees. But Transworld's knowledge of the FDCPA requirements is not the relevant issue. Jenkins must present some evidence that Transworld knew that the $25 fee it attempted to collect was in fact not authorized by law or contract, and then tried to collect it anyway. *See Jenkins*, 128 F.3d at 832. She has presented no such evidence. As such, Jenkins loses on the intent issue.

■■■■ Transworld next argues that it satisfies the requisites of section 1692k(c)'s "bona fide error" defense. This provision absolves of liability a debt collector who has shown by a preponderance of the evidence that (1) it violated the FDCPA unintentionally, and (2) has in place procedures reasonably adapted to avoid the violation it committed.[18] The affirmative bona fide error defense is "unrelated to the issue of whether a plaintiff has proven a debt collector's actual knowledge of facts sufficient to sustain a

cause of action under § 1692(e)." *Hubbard v. National Bond & Collection Assocs., Inc.*, 126 B.R. 422, 429 (D.Del.1991). "The mere assertion of good intent, absent a factual showing of actual safeguards reasonably adopted to avoid violations of the FDCPA, is insufficient" to sustain the defense. *Oglesby v. Rotche*, 1993 WL 460841, at *9 (N.D.Ill. Nov. 5, 1993); *see also Green v. Hocking*, 792 F.Supp. 1064, 1066 n. 5 (E.D.Mich.1992) (rejecting bona fide error defense where defendant merely asserted the error was unintentional without supplying evidence of procedural safeguards.).

While Jenkins argues that the adequacy of Transworld's procedures is one of fact, other courts have ruled on this issue as a matter of law in appropriate circumstances. *See, e.g., Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383, 389 (D.Del.1991) (procedures were adequate where defendant held periodic seminars and provided training on FDCPA requirements, and gave employees various editions of a FDCPA manual, issued a three-page memorandum setting forth its FDCPA policy, and posted a 5″ by 8″ card over every telephone citing language required by the Act); *Howe v. Reader's Digest Ass'n*, 686 F.Supp. 461, 467 (S.D.N.Y.1988) (granting summary judgment based on bona fide error defense where affidavits detailed the "extensive systems and procedures," including use of an independent auditing agency, to ensure compliance with the FDCPA).

■■■■ Although Transworld's relevant procedures are fairly simple, they are clearly reasonably adapted to avoid the imposition of unauthorized fees. Clients are instructed in writing to submit only those charges to which they are legally entitled. Transworld includes this admonition in the "installation packet" provided to prospective clients and repeats it on the "Start Service" form. Furthermore, clients are advised to consult with an attorney before adding any such fees. Transworld also issued memos to its sales staff directing them to reinforce this message

---

18. *Jenkins argues that the bona fide error defense covers only clerical or administrative errors, not errors of judgment or law. For support, she cites to numerous cases that deal with the Truth in Lending Act's bona fide error provi-* sion. However, the Seventh Circuit rejected this exact argument, distinguishing the FDCPA's bona fide error provision from TILA's. *Jenkins v. Heintz*, 124 F.3d 824, 833 n. 7 (7th Cir.1997).

to prospective clients. Jenkins argues that Transworld's failure to advise clients specifically that they are not to submit service charges added to stopped checks "almost guarantees" that such a client error will occur. Transworld counters that a blanket prohibition on adding service fees is impractical because remedies for dishonored checks vary among states and private contracts may permit fees for stopped checks.

It is true that Transworld could conceivably add to its procedures (for instance, the "Start Service" form includes a space to indicate that "NSF service" is desired, but does not include a similar space for stopped checks). However, in light of *Jenkins'* clear directive that debt collectors may reasonably rely on information provided by the creditor-client, and Transworld's evidence of its policy to instruct clients to seek legal counsel in determining which fees are legally due, we find as a matter of law that the procedures were adequate. Transworld therefore prevails on its bona fide error defense. In making this determination, we emphasize that the statutory violations here were initiated by the creditor-client, who acted in direct opposition to Transworld's directive to include only legally due charges.

Our holding is also consistent with the decision in *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1032 (6th Cir.1992), which held that the *very same* debt collector's specific instructions to claim only amounts legally due and owing were adequate to sustain a bona fide error defense. "Because the appellee employs procedures reasonably adapted to prevent errors in amounts referred for collection, [defendant] reasonably relied on the accuracy of [creditor's] debt figure; the resulting mistake was bona fide error pursuant to 15 U.S.C. § 1692k(c)." *Id.* at 1032. *See also Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 401–02 (6th Cir.1998) (defendant's procedure manual and computer system were adequate to establish bona fide error defense in light of the fact that violation arose from clerical error by creditor-client, not defendant). Because Transworld has established that its efforts to collect an unauthorized fee were unintentional, and that it maintained procedures reasonably adapted to avoid the imposition of unauthorized fees, it is entitled to

summary judgment on Count II. Plaintiffs' motion for partial summary judgment is denied as to Count II.

## V. Union's Potential Liability Under the FDCPA

We must now determine whether Union is responsible for the FDCPA violations that have been established. In their cross-motion for summary judgment, defendants Union and Transworld argue that Union is not liable to the plaintiffs for the actions of its subsidiary, Transworld. The defendants note that Union is a holding company that plays no role in collecting debts, belying any claim that it is a debt collector under the FDCPA. Moreover, defendants contend that they are distinct, independently operated corporations, and that Transworld cannot be characterized as Union's "instrumentality." Thus, they argue, Union should not be liable under traditional "piercing the corporate veil" analysis.

Plaintiffs argue that because Union controls Transworld's debt collection practices, and receives the bulk of its revenue from those practices, it is indirectly engaged in debt collection. Plaintiffs also contend that Union is aware of Transworld's FDCPA violations and has the power and responsibility to correct them. Finally, plaintiffs maintain that Union should be held liable for Transworld's transgressions because it is a corporate fiction designed to avoid the FDCPA's net worth limitation on recovery. They urge the use of a more liberal application of traditional veil piercing analysis in light of the FDCPA's status as federal consumer protection statute.

The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or asserted to be owed or due to another." 15 U.S.C. § 1692a(6). Plaintiffs have not alleged any facts that show Union directly participated in any of Transworld's debt collection activities. To find Union liable as an indirect debt collector under the FDCPA, plaintiffs must show Union and Transworld

share an interdependence that renders them a "single economic enterprise." *Harrison v. NBD, Inc.,* 968 F.Supp. 837, 845 (E.D.N.Y. 1997); *see also Moore v. National Account Sys., Inc.,* 1991 WL 313896, at *2 (D.Conn. Nov.13, 1991); *United States v. ACB Sales & Serv., Inc.,* 590 F.Supp. 561, 574 (D.Ariz. 1984).

In *ACB Sales,* the court held that a corporate parent and its sixteen subsidiary collection agencies constituted a single economic enterprise based on the companies' "appearance to the public and the actual interdependent relationship between them." 590 F.Supp. at 575. The court noted that the parent's name was on each subsidiary's letterhead. *Id.* Furthermore, the parent entered into contracts with creditors for the debt collection services provided by the subsidiaries. *Id.* It provided management, accounting, purchasing and administrative services for the local offices. *Id.* Finally, all the companies were managed by "an interlocking directorate" of three individuals. *Id.* "Consequently, [defendants], albeit indirectly, are debt collectors under the FDCPA and, therefore, are liable for all violations of the FDCPA committed by the local [subsidiaries]." *Id.* at 576.

In contrast, Union plays no role in either the actual debt collection process or in procuring creditor-clients. The Union name does not appear on any Transworld correspondence. The two corporations do not share any facilities, employees or a computer system. One Transworld officer sits on Union's board and one Union director is a Transworld officer. Both corporations maintain their own accounting departments and keep separate corporate minutes. Although the bulk of Union's profits come from Transworld dividends, this amount is set after Transworld determines its immediate and long-range cash requirements. Other courts have found allegations of more extensive interdependence within a parent-subsidiary relationship insufficient to state a FDCPA claim against a collector's corporate parent. *See Stepney v. Outsourcing Solutions, Inc.,* 1997 WL 722972at *2–*3 (N.D.Ill. Nov.13, 1997) (allegations that defendant parent pur-

chased portfolios of old consumer debts, implemented the policies and practices of its subsidiary collection company, and financed the collection activities at issue failed to support a finding of a single economic enterprise.); *Harrison v. NBD, Inc.,* 968 F.Supp. 837, 845 (E.D.N.Y.1997) (parent corporation's approval of both the collection demand form and the deceptive practices of its subsidiary were inadequate to render defendants a single economic enterprise.) Plaintiffs fall far short of establishing the facts necessary to find that Union and Transworld are engaged in a single economic enterprise, a finding required to make Union an indirect debt collector under the FDCPA.

Absent such a showing, Union can be liable for Transworld's FDCPA violations only by presenting evidence that (1) Transworld is a "mere instrumentality" of Union, and (2) recognizing Transworld's corporate existence would work a fraud or injustice on the plaintiffs, so as to warrant piercing the corporate veil.[19] *Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 570 (7th Cir.1985) ("Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.") (citing *Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981)). On the instrumentality/control factor, "the Illinois courts have considered some of the following: (1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Id.* at 570.

Plaintiffs argue that because this case involves a federal consumer protection statute, the court should apply a more lenient standard, such as the one employed in cases

---

**19.** This is the two-part test for piercing the corporate veil under Illinois law. The parties do not dispute that Illinois law governs whether we

should hold Union liable under a veil-piercing theory.

involving section 5 of the Federal Trade Commission Act, where liability has been imposed on parent corporations without rigidly adhering to common law veil-piercing analysis. *See, e.g., P.F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 267 (6th Cir.1970) ("[W]here the public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required in the determination of whether a parent should be held for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute."). But plaintiffs fail to show how employing traditional veil-piercing analysis here would circumvent the FDCPA's policies. Indeed, the Seventh Circuit recently applied the traditional veil piercing test to determine whether a corporate parent should be liable for the acts of its subsidiary under the FDCPA. *See Aubert v. American General Finance, Inc.,* 137 F.3d 976, 978 (7th Cir.1998). In rejecting the plaintiff's attempt to hold three corporations jointly liable for FDCPA violations, the court observed that the plaintiff failed to present any evidence, "such as inadequate capitalization or a failure to observe the legal requirement of separate corporate existences, to justify the unusual remedy of piercing the corporate veil." *Id.*

▮ In the instant case, plaintiffs have failed to present any evidence that Transworld is a mere instrumentality subject to Union's total control, or that observing Transworld's corporate existence would work an unjustice or fraud on them. First, the same facts that demonstrate Union and Transworld are not a single economic enterprise compel the conclusion that Transworld is not a mere instrumentality of Union. In addition, there is no evidence that the two companies have failed to observe corporate formalities, that Transworld is a sham corporation, is inadequately capitalized, or that it would be unable to afford the plaintiffs' damages. Union and Transworld each have their own officers and board of directors—with only two overlapping members—and keep separate minute books and accounting records. It is undisputed that Transworld existed prior to its involvement with Union and that Transworld has a net worth of $11 million. In light of these facts, we find no justification for piercing the corporate veil or for finding Union liable for Transworld's debt collection activities. Accordingly, we grant Union's motion for summary judgment in its entirety.

## CONCLUSION

To summarize, the Court finds as follows:

(1) Transworld's typeface did not visually overshadow the validation notice in violation of § 1692g in the November 1, 1995 letter to Jenkins or the August 22, 1995 letter to Terrafino.

(2) Transworld violated the requirements of § 1692g by using language that overshadowed the validation notices in the November 1, 1995 and August 22, 1995 collection letters sent to Jenkins and Terrafino, respectively.

(3) Transworld did not violate § 1692g or any other provision of the FDCPA in the second common letter sent to both Jenkins and Terrafino.

(4) Transworld did not violate § 1692g with overshadowing language in Jenkins' third letter, dated November 24, 1995.

(5) Fact issues prevent the Court from determining, as a matter of law, whether Transworld's third letter to Jenkins misrepresented the amount of time remaining in the validation period in violation of § 1692e.

(6) Transworld did not request that Jenkins or Terrafino contact the creditor by telephone in violation of § 1692g.

(7) Transworld did not threaten legal action against Terrafino in violation of § 1692e(5).

(8) Transworld's presentation of the "Colorado" information on the reverse side of all six letters is false, deceptive and misleading in violation of § 1692e.

(9) Transworld did not intentionally seek to collect an unauthorized fee from Jenkins in violation of §§ 1692f(1) or 1692e(2)(a), and it has a bona fide defense to these claims.

(10) Union Corp. is not a debt collector as defined in the Act and is not liable for any of the above FDCPA violations committed by Transworld.

Accordingly, as set forth above and for the reasons stated, the parties' motions for summary judgment are hereby GRANTED in part and DENIED in part.