**Raul AVILA, on Behalf of Himself and All Others Similarly Situated, Plaintiff–Appellee,**

**v.**

**Albert G. RUBIN and Van Ru Credit Corporation, Defendants– Appellants.**

Nos. 95–2881, 95–2895, 95– 3905 and 95–3978.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1996.

Decided May 16, 1996.

---

Daniel A. Edelman, J. Eric VanderArend, Michelle A. Weinberg (argued), O. Randolph Bragg, Tara L. Goodwin, Cathleen C. Cohen, James O. Latturner, Edelman & Combs, Chicago, IL, Joanne Faulkner, New Haven, CT, for plaintiff-appellee in No. 95-2881.

Daniel A. Edelman, Cathleen M. Combs, Tara G. Redmond, J. Eric VanderArend, Michelle A. Weinberg (argued), Edelman & Combs, Chicago, IL, Joanne Faulkner, New Haven, CT, for plaintiff-appellee in No. 95-2895.

Daniel A. Edelman, Cathleen M. Combs, Tara G. Redmond, J. Eric VanderArend, Michelle A. Weinberg (argued), O. Randolph Bragg, Edelman & Combs, Chicago, IL, Joanne Faulkner New Haven, CT, for plaintiff-appellee in No. 95-3905.

Daniel A. Edelman, J. Eric VanderArend, Michelle A. Weinberg (argued), O. Randolph Bragg, Tara L. Goodwin, Edelman & Combs, Chicago, IL, Joanne Faulkner, New Haven, CT, for plaintiff-appellee in No. 95-3978.

George W. Spellmire, Bruce L. Carmen (argued), D. Kendall Griffith, David M. Schultz, Hinshaw & Culbertson, Chicago, IL, for defendant-appellant in No. 95-2881.

Daniel P. Shapiro (argued), Michael J. Small, Steven A. Levy, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Chicago, IL, for defendant-appellant in Nos. 95-2895 and 95-3905.

George W. Spellmire, Bruce L. Carmen (argued), David M. Schultz, Hinshaw & Culbertson, Chicago, IL, for defendant-appellant in No. 95-3978.

Before BAUER, CUDAHY, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Can a person, licensed to practice law, be in violation of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, for sending dunning collection letters that purport to be from an "attorney"? This is one of two interesting questions we address today in this case involving Raul Avila (and a class of similarly situated persons), the Van Ru Credit Corporation, and Albert G. Rubin, an attorney-at-law from Skokie, Illinois. As Joe Friday would say, let's get to the facts. We will, but unlike Sergeant Friday, it won't be "just the facts" as we'll mix in some observations and findings along the way.

Avila is a student loan debtor living in Connecticut. Van Ru Credit Corporation is a collection agency in Skokie, Illinois. Rubin is an Illinois attorney. Although we were told at oral argument that Rubin and the Van Ru agency are separate, they actually seem to be as closely intertwined as lovers during an embrace. Here's the situation from which, we think, that conclusion is justified.

Rubin founded Van Ru and owns 80 percent of its corporate stock. The remainder is owned by Van Ru's president, who is Rubin's son. Rubin is Van Ru's chief executive officer, draws a large salary from the company, and, until eight years ago, managed Van Ru's day-to-day collection activities. Rubin is involved in the creation and modification of form letters, the most critical part of the debt collection operation.

In addition to his duties at Van Ru, Rubin has a law office which he calls Rubin & Associates. Rubin & Associates is located on the third floor of the "Van Ru Building." The Van Ru Building is owned by Van Ru Credit Services, Inc., and Rubin owns 75 percent of this firm. Rubin & Associates splits the third-floor space of the building with Van Ru. Rubin & Associates is comprised of Rubin, one other attorney, and some 35 "legal assistant collectors." The primary business of Rubin & Associates is to send form letters to delinquent debtors urging them to pay their debts and to refer the files of delinquent debtors to other attorneys for litigation. Neither Rubin nor the other attorney in his office actually litigates in Connecticut, and it is unclear (but we think doubtful) whether they litigate anywhere. Rubin & Associates receives all its business from Van Ru after Van Ru's efforts to collect debts are unsuccessful. Van Ru pays Rubin & Associates a monthly retainer for work that Rubin & Associates does on debtor accounts.

Rubin personally maintains offices in both the Van Ru and Rubin & Associates offices. Rubin works at Van Ru around 20 hours a week and spends some 30 hours each week working at Rubin & Associates. Van Ru and Rubin & Associates use the same computer system and internal account number to identify files. Van Ru and Rubin & Associates also utilize the same automated telephone dialing system to call delinquent debtors; employees from both entities sit next to each other when using the system. Van Ru and Rubin & Associates receive mail at the same post office box. Van Ru and Rubin & Associates use the same printer for their respective form letters. The two also use the same machine to fold and process form letters in preparation for mailing. The mailing machine processes Van Ru and Rubin & Associates letters simultaneously, resulting in stacks of mixed letters ready for mailing. The letters of both Van Ru and Rubin & Associates are placed in identical envelopes. The printer and mailing machine are operated, and the letters are handled, by employees of Pegasus Data Systems, Inc., a company located at the same address as Van Ru and Rubin & Associates. Rubin owns 50 percent of Pegasus.

Although Van Ru and Rubin & Associates utilize the same computer system, Van Ru employees do not issue Rubin & Associates letters or input data into a debtor's file after it is transferred to Rubin & Associates. Once a file is referred to Rubin & Associates, Van Ru's employees generally do not pursue collection activities against the debtor.

Avila allegedly owes money on a student loan to his creditor, the Connecticut Student Loan Foundation. The foundation has a written contract with Van Ru and an oral agreement with Rubin for debt collection services. The foundation forwarded Avila's account for collection to Van Ru via electronic data transmission. As is its practice, the foundation did not forward underlying documentation about Avila's loan. Van Ru sent Avila two demand or "dunning" letters in an attempt to collect the debt. Avila did not respond. Van Ru then "referred" Avila's account to Rubin & Associates. Rubin & Associates then cranked out three dunning letters to Avila on attorney letterhead in an attempt to collect the debt. The five form letters are the basis for this suit, filed by Avila (as a class action) against Van Ru and Rubin. Now let's look at the letters.

The first letter (we'll call it exhibit A), dated November 22, 1993, tells Avila that Van Ru intends to collect his debt. It informs Avila of his right to dispute the validity of the debt within 30 days. Ten days later, on December 2, 1993, Van Ru sent Avila a second letter, exhibit B, which demanded that Avila "commence immediate repayment of [the] loan" and threatened that "[i]f payment is not received, a civil suit may be initiated against you by your creditor."

The next three letters, which we'll call exhibits C, D, and E, were sent by Rubin & Associates on the following letterhead:

Albert G. Rubin, Ltd.
Attorney at Law
P.O. Box 1010
Skokie, IL 60076–8010
1–800–766–7887

Exhibit C, dated January 4, 1994, tells Avila of his right to dispute or verify the debt. This information is immediately followed by the sentences: "If the above does not apply to you, we shall expect payment or arrangement for payment within ten (10) days from the date of this letter. If payment is not received, a civil suit may be initiated against you by your creditor for repayment of your loan...." Exhibit A, the first letter from Van Ru, also contained this statement.

Exhibits D and E are letters from Rubin demanding payment from Avila and threatening a civil suit if payment is not forthcoming. Exhibits D and E do not notify Avila of a right to dispute the debt. Exhibits C through E are mass-produced collection letters "signed" with a mechanically reproduced facsimile of the signature of attorney "Albert G. Rubin."

Mr. Rubin reviews and approves the general form used on letters sent by Rubin & Associates. He does not, however, personally prepare, sign, or review any of the letters sent to targets, including Avila. This is understandable, for Rubin would probably be in the hospital with a severe case of writer's cramp if he did because some 270,000 such letters go out each year. That, by the way, comes out to 1,062 per working day, 133 per working hour.

The letters from attorney Rubin are actually the product of a nonattorney "legal assistant collector" who directs the computer to generate a letter on Rubin's attorney letterhead. Legal assistant collectors are provided with a training manual developed by Rubin to help them determine when an attorney debt collection letter is warranted. According to Rubin, the collectors use their "skill, judgment, and training" to determine when a letter should be sent.

Claiming that the letters, exhibits A–E, were violations of the FDCPA,[1] Avila filed this suit in the spring of 1994. Class certification, not challenged here, was granted, and discovery continued until the parties filed joint motions for summary judgment on liability. Avila's motion carried the day as Rubin was held liable to the class under §§ 1692g and 1692e(3) and (9) of the FDCPA, and Van Ru was found liable as well under § 1692g. Van Ru and Avila stipulated to damages of $20,000 and judgment in that amount was entered. Then, following a bench trial on the issue of statutory damages, judgment was entered for Avila against Rubin for $84,983. Rubin and Van Ru appeal.

---

1. A state claim under the Connecticut Unfair Trade Practices Act was abandoned.

The rules for granting summary judgment and our standard of review are well-known and need not be repeated. Suffice to say that the facts are not in dispute and only questions of law are present which we review on a clean slate.

A "validation notice" is required by law to be present in letters seeking to collect debts. FDCPA, 15 U.S.C. § 1692g. Essentially, the notice required by § 1692g must tell the target that she has 30 days to dispute the validity of all or a portion of the debt. If not disputed, the collector may assume the debt to be valid.

After some anguish, we held in *Gammon v. GC Servs. Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir.1994), that claims against debt collectors under the FDCPA are to be viewed through the eyes of the "unsophisticated consumer." We rejected what may be viewed as a somewhat lesser standard—the "least sophisticated consumer," used by other courts. We reiterate our standard today, but we don't want to be involved in the splitting of split hairs. Anyway it's viewed, the standard is low, close to the bottom of the sophistication meter.

Exhibits A and C, the first letters sent by Van Ru and Rubin, included the required 30-day debt verification notice. Both, however, followed the notice with the confusing statement we previously noted: "If the above does not apply to you, we shall expect payment or arrangement for payment to be made within ten (10) days from the date of this letter." The letter from Van Ru followed up on this statement by telling the debtor that "[t]his will avoid additional proceedings by our firm." The letter from Rubin followed up the statement by saying, "If payment is not received, a civil suit may be initiated against you by the creditor for repayment of your loan . . . ."

We think that telling a debtor he has 30 days to dispute the debt and following that with a statement that "[i]f the above does not apply" you have ten days to pay up or real trouble will start is entirely inconsistent, and a failure to comply, with the FDCPA. We think the unsophisticated consumer would be scratching his head upon receipt of such a letter. He wouldn't have a clue as to what he was supposed to do before real trouble begins. A debt validation notice, to be valid, must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message. To protect the uninformed, the naive, and the trusting—the sort of people who easily fit under the umbrella of the "unsophisticated consumer"—the notice cannot be as misleading and tricky as the one used here by Van Ru and Rubin. We think the validation notice was clearly overshadowed by the language that followed on its heels. So, like the district court, we believe that both Rubin and Van Ru are guilty of not complying with § 1692g of the FDCPA.

Before leaving this topic and moving on to the lawyering charges against Rubin, we need to address a point upon which the two defendants want to hang their hats. The defendants contend that *Gammon* fundamentally changed the standard for evaluating FDCPA violations. They assert that under the "unsophisticated consumer" standard, Avila must submit extrinsic evidence, such as a survey, showing that a significant proportion of his class believed that the validation notice was contradicted. For support, they cite Judge Easterbrook's concurrence in *Gammon*. The letter at issue in *Gammon* contained a literally true statement with a possibly misleading implication. In the final paragraph of his concurrence, Judge Easterbrook suggests that on remand the plaintiff in *Gammon* should show that a "significant fraction" of addressees of the letter were deceived, "for if showing a handful of misled debtors were enough, we would as a practical matter be using the 'least sophisticated consumer' doctrine." *Gammon*, 27 F.3d at 1260 (Easterbrook, J., concurring). Judge Easterbrook also suggested that trademark cases might aid the district court in determining the existence and extent of any misunderstanding flowing from the literally true statement. The defendants interpret Judge Easterbrook's comments to mean that a heightened standard for FDCPA violations now exists in this circuit and that every FDCPA plaintiff must submit extrinsic evidence that a significant proportion of collec-

tion notice addressees were deceived by the notice. They are reading far too much into Judge Easterbrook's observations.

*Gammon* does not significantly change the *substance* of the "least sophisticated consumer" standard as it had been routinely *applied* by courts. Instead, *Gammon* concluded that the term "unsophisticated consumer" is a simpler and less confusing formulation of a standard designed to protect those of below-average sophistication or intelligence. As a result, the court stated "[w]e will use the term, 'unsophisticated,' instead of the phrase, 'least sophisticated,' to describe the hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading." *Gammon*, 27 F.3d at 1257. The new terminology reconciles the former standard's literal meaning with its application. *Id.* As Avila correctly observes, the unsophisticated consumer standard is a distinction without much of a practical difference in application.

Judge Easterbrook's concurrence is consistent with this analysis. Judge Easterbrook notes that the newly named standard looks to a "hypothetical" unsophisticated consumer in the same sense that the reasonable person of tort law is hypothetical. *Gammon*, 27 F.3d at 1259. Because the letter in *Gammon* was literally true but possibly misleading, Judge Easterbrook suggests that the plaintiff on remand should show that a significant number of the letter's addressees interpreted the statement in the letter in a way that violates FDCPA. The implication the defendants urge is that this is the only way a plaintiff can demonstrate that a reasonable, unsophisticated consumer would be deceived by the statement. We think not.

■ We also think the defendants' reliance on false advertising cases from trademark law is unavailing here. Section 43(a)(2) of the Lanham Act prohibits statements that are (1) literally false and (2) statements that, while literally not false or ambiguous, convey a false impression or are misleading in context. *See Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir.1992). The general rule is that if a statement is literally false, the court may grant relief without reference to the reaction of buyers or consum-

ers of the product. On the other hand, if a statement is not literally false, the court may find that it is impliedly misleading only if presented with evidence of actual consumer deception. *Id.* at 14.

Avila claims Van Ru contradicted the validation notice and that Rubin both contradicted the validation notice and improperly sent attorney form letters. These claims resemble a literally false statement more than an ambiguous but potentially misleading statement. Just as the analysis involved in evaluating a literally false statement turns on whether the statement is true or false, the language in the collection letters either contradicts the validation notice or it does not.

We think Avila's claims are distinguishable from those in *Gammon*. There, the collection agency stated it had provided the systems for a major branch of the federal government to use in collecting delinquent taxes. *Gammon*, 27 F.3d at 1257. This statement was literally true, but we held that a consumer might interpret it as implying that the debt collector was affiliated with the United States, in violation of FDCPA. *Id.* at 1258. Unlike Avila's claims, *Gammon* involved a literally true statement with the potential for deception. The statements involved here, because they are inconsistent and contradictory, are more akin to a literally false statement in the context of a trademark case. Accordingly, our finding that the defendants violated § 1692g, without reference to evidence of actual consumer confusion, is appropriate.

■ We move now to the attorney letters, exhibits C, D, and E, noting first that § 1692e of the FDCPA provides:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

. . . .

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

. . . .

(9) The use or distribution of any written communication ... which creates a false impression as to its source, authorization, or approval.

Avila contends that the three letters from Rubin constitute a false, deceptive, or misleading representation because the letters are not "from an attorney" as that term has been defined for the purposes of § 1692e(3) of FDCPA.

Rubin's dunning letters implore Avila to pay his debt. The form letters, as we noted, are mass-produced and are mechanically signed "Albert G. Rubin" under his "attorney" letterhead. As we also noted, 270,000 letters of this sort went out in the year prior to the filing of this suit.

The leading case on whether mass-produced mailings by an attorney violate the proscriptions of FDCPA is *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir.1993). The facts of *Clomon* are similar to those presented here. In *Clomon*, a debt collection agency mailed dunning letters to debtors after receiving accounts on computer tape from the creditor. An attorney was employed part-time as general counsel for the agency. The agency's computer system caused each letter to be printed, folded, and placed in an envelope for mailing. The plaintiff received six form letters from the agency. The first letter was sent on the letterhead of an "account supervisor." The remaining five were sent on the attorney letterhead of the general counsel for the agency. Although the general counsel was indeed an attorney and employed by the agency, the letters were not actually signed by the attorney; instead, they bore the mechanically reproduced facsimile of his signature. The attorney letters implored the debtor to pay up and threatened legal action if payment was not forthcoming. *Clomon*, 988 F.2d at 1316–17.

The attorney in *Clomon* personally approved the "form" of the letters and "approved the procedures according to which those letters were sent." *Id.* at 1317. The attorney had no direct personal involvement in the mailing of the letters to the plaintiff or to any other debtor. In short, the attorney "never considered the particular circumstances of Clomon's case prior to the mailing of the letters and he never participated personally in the mailing." *Id.* at 1317.

The Second Circuit held that the use of the attorney's letterhead and his signature on the collection letters was sufficient to give the consumer (the court used the "least sophisticated" consumer) the false impression that the letters were communications from an attorney. *Id.* at 1320. The letters were false and misleading because although the attorney's name and signature were on them, they were not "from" the attorney in any meaningful sense of the word. *Id.* In reaching its conclusion, the court found significant the fact that the attorney did not review each debtor's file, did not determine when particular letters should be sent, did not approve the sending of particular letters based upon the recommendations of others, did not see particular letters before they were sent, and did not know the identities of the persons to whom the letters were issued. *Id.* Accordingly, it held that sending attorney dunning letters in this manner violated § 1692e(3).

■ *Clomon* establishes that an attorney sending dunning letters must be directly and personally involved in the mailing of the letters in order to comply with the strictures of FDCPA. This may include reviewing the file of individual debtors to determine if and when a letter should be sent or approving the sending of letters based on the recommendations of others. *See Clomon*, 988 F.2d at 1320. Given these requirements, *Clomon* concluded that "there will be few, if any, cases in which a mass-produced collection letter bearing the facsimile of an attorney's signature will comply with the restrictions imposed by section 1692e." *Id.* at 1321.

The undisputed facts in our case establish that Rubin has no real involvement in the mailing of dunning letters to debtors. Like the attorney in *Clomon*, he has a cozy relationship with the "referring" collection agency. Rubin is not personally or directly involved in deciding when or to whom a dunning letter should be sent. There is no true "judgment" being rendered here by a real attorney. Like the attorney in *Clomon*, Rubin did not review the debtor's file; he did not determine when particular letters

should be sent; he did not approve the sending of particular letters based upon the recommendation of others; he did not see particular letters before they were sent; and he did not even know the identities of the debtors to whom the letters were sent. Instead, Rubin said at his deposition that letters are only brought to his attention for advice and guidance when there is "some unusual problem or something different [or] out of the ordinary comes up."

Given these undisputed facts, Judge Conlon in the district court correctly concluded that Rubin violated § 1692e(3) and (9) because his collection letters create the false and misleading impression that the communications were from an attorney when, in fact, they were not really "from" an attorney in any meaningful sense of the word.

An unsophisticated consumer, getting a letter from an "attorney," knows the price of poker has just gone up. And that clearly is the reason why the dunning campaign escalates from the collection agency, which might not strike fear in the heart of the consumer, to the attorney, who is better positioned to get the debtor's knees knocking.

A letter from an attorney implies that a real lawyer, acting like a lawyer usually acts, directly controlled or supervised the process through which the letter was sent. That's the essence of the connotation that accompanies the title of "attorney." A debt collection letter on an attorney's letterhead conveys authority. Consumers are inclined to more quickly react to an attorney's threat than to one coming from a debt collection agency. It is reasonable to believe that a dunning letter from an attorney threatening legal action will be more effective in collecting a debt than a letter from a collection agency. The attorney letter implies that the attorney has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action. And the letter also implies that the attorney has some personal involvement in the decision to send the letter. Thus, if a debt collector (attorney or otherwise) wants to take advantage of the special connotation of the word "attorney" in the minds of delinquent consumer debtors to better effect collection of the debt, the debt collector should at least ensure that an attorney has become professionally involved in the debtor's file. Any other result would sanction the wholesale licensing of an attorney's name for commercial purposes, in derogation of professional standards:

> [A] lawyer has been given certain privileges by the state. Because of these privileges, letters ... purporting to be written by attorneys have a greater weight than those written by laymen. But such privileges are strictly personal, granted only to those who are found through personal examination to measure up to the required standards. Public policy therefore requires that whatever correspondence purports to come from a lawyer in his official capacity must be at least passed upon and approved by him. He cannot delegate this duty of approval to one who has not been given the right to exercise the functions of a lawyer.

American Bar Association, Formal Opinion 68 (1932).

■ The defendants make two final arguments. First, they claim that mass mailing is economically efficient and necessary in the debt collection industry. This argument has been rejected by several courts. *See Clomon*, 988 F.2d at 1321. As *Clomon* stated, "[n]o mass mailing technique is permissible—regardless of how effective it might be—that technique constitutes a false, deceptive, or misleading communication." *Id.* An attorney's signature implies the attorney has formed a professional judgment about the debtor's case; these implications will frequently be false in a mass mailing situation. *Id.*

Second, the defendants argue that holding Rubin liable will effectively condemn the use of paralegals and assistants in a law office. This argument is untenable. As Judge Conlon noted:

> Paralegals do not (or should not) engage in the practice of law. Paralegals do not intake a new client, decide whether a lawsuit is warranted, prepare unreviewed pleadings, stamp the attorney's signature, and file the lawsuit, all without the considered approval of the attorney. Attorneys personally supervise and review paralegals'

work, consider the case, and approve the recommendations or work.

Albert G. Rubin, acting *as* an attorney, was not the real "source" of the letters in this case. The true source of the "attorney" letters was the collection agent who pressed a button on the agency's computer. "Albert G. Rubin & Associates, Ltd." is a collection agency, not a law firm at all in any real sense of the term. The "law firm" does not have a retainer agreement with plaintiff's creditor. No attorney working in the "law firm" ever files a lawsuit or goes to court on behalf of a client. We agree with the district court and with the Second Circuit in *Clomon.* Rubin was correctly found to be on the wrong side of the FDCPA.

As a final matter, Rubin takes a stab at challenging the amount of damages set by the district court. We have considered his objection and find it to be without merit. Accordingly, the judgments of the district court are

AFFIRMED.