# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2289

MICHAEL DURKIN and LORETTA REED,
individually and on behalf of all
others similarly situated,

*Plaintiffs-Appellants,*

*v.*

EQUIFAX CHECK SERVICES, INC.,
a Delaware corporation,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 4832—**William J. Hibbler**, *Judge.*

_____

ARGUED DECEMBER 2, 2004—DECIDED APRIL 18, 2005

_____

Before COFFEY, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Equifax Check Services, Inc.,[1] uses
a series of form letters to assist it in collecting debts from
dishonored checks. Equifax mailed such a series of letters to

---

[1] Equifax is now known as Certegy Check Services, Inc.

Michael Durkin and, separately, to Loretta Reed. Believing that certain letters were unacceptably confusing, Durkin, and later Reed, sued Equifax under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.* The district court consolidated the two actions into one. After denying the plaintiffs summary judgment, the district court granted Equifax's motion to exclude the plaintiffs' only expert witness. This evidentiary ruling led Equifax to move for summary judgment, arguing that the plaintiffs failed to bring forth the necessary extrinsic evidence to support their case. The district court agreed and granted Equifax summary judgment. The plaintiffs appealed. We affirm.

## I.

Equifax, through its check authorization and warranty service, protects retailers from being stuck with bad checks. Under the service, when a customer presents a retailer with a check, the retailer contacts Equifax, and Equifax determines whether it will stand behind the check and authorize it or whether it will deny acceptance of the check. Equifax makes this determination by reviewing its database of check writing information. If Equifax authorizes a check that is later dishonored, Equifax purchases the check from the retailer at face value, making the retailer whole, and then pursues collection efforts on its own behalf. Two retailers who have subscribed to this service are Funco, Inc., (also known as Funcoland) and Sears, Roebuck and Company.

On March 15, 2000, Equifax authorized a $217.45 check in Michael Durkin's name payable to Funco. Durkin's checking account, however, was closed, and the check was dishonored. Funco submitted the dishonored check to Equifax, and Equifax purchased the check at face value. Equifax then began its collection efforts and sent Durkin a collection

letter on April 12, 2000. This initial letter contained a notice of certain rights afforded to Durkin under the FDCPA. Specifically, Equifax informed Durkin—in accordance with 15 U.S.C. § 1692g(a)-(b) and the corresponding safe-harbor language drafted by this court in *Bartlett v. Heibl*, 128 F.3d 497, 501-02 (7th Cir. 1997)—that he had thirty days from his receipt of the letter to dispute the validity of the debt and that disputes should be in writing. This thirty-day period is commonly called the "validation period," and the afore-mentioned notice is routinely referred to as the "validation notice." With no response from Durkin, Equifax sent a second letter on April 24, 2000, and likewise a third letter on May 8, 2000. Equifax also made a telephone call to Durkin during this period. The second and third collection letters did not discuss or reference the validation period, nor did they reiterate any of the rights and procedures spelled out in the initial letter's validation notice. Each of the three letters appears in the appendix to this opinion.[2]

---

[2] The upper right-hand corners of the first and second letters (and presumably the third as well) declare: "Please read infor-mation on reverse side." The reverse side of each letter (including the third) states, in its entirety: "EQUIFAX CHECK SERVICES NOTICE[;] P.O. Box 30032[,] Tampa, Florida 33630-3032[;] TELEPHONE MONITORING CONSENT[:] We randomly moni-tor telephone conversations between callers and Equifax Check Services employees, solely to evaluate our employees' performance and determine if additional employee training is necessary, and for no other purpose. Your consent to this practice will be as-sumed unless at the beginning of each call you instruct us not to monitor the conversation, in which case such monitoring, if any, will be discontinued for that call." This information is not included in the appendix to this opinion to avoid needless repetition. We include it here to fully inform readers about the contents of each

(continued...)

Within a day or two of receiving the initial letter, Durkin forwarded it to his attorney, an experienced FDCPA practitioner. Durkin had retained the attorney to handle financial and legal matters arising from the theft of his checkbook in August 1999. The check presented to Funco in March 2000 was among the checks stolen. Durkin's signature on the Funco check was thus a forgery, and the checking account had been closed at the time the forged check was written. Durkin and his attorney were therefore aware of the problem with the checking account when the initial letter arrived in April. Nevertheless, the attorney did not lodge a written dispute with Equifax until May 8, 2000, after the second letter had arrived and the day that the third letter was sent. Equifax, once informed about the forgery, ceased all collection activity and expunged Durkin's check writing history of any negative references regarding the Funco check. Three months later, Durkin's attorney filed a class action, with co-counsel, under the FDCPA against Equifax in the Northern District of Illinois using Durkin as the named plaintiff. The complaint alleged FDCPA violations on behalf of individuals who had received the same form letters.

Separately, a different set of attorneys brought a virtually identical FDCPA class action in the Northern District of Illinois against Equifax with Loretta Reed as their lead plaintiff. Reed wrote a $76.30 check to Sears. Equifax authorized the check. Nonetheless, the check was dishonored

---

(...continued)

letter. Separately, we note that, in the appendix, the right-hand margin of the first letter and the top margin of the third letter are less than perfect, cutting off small amounts of information. The copies used in the appendix were the best the record had to offer. Nevertheless, the letters are clearly understandable, and the imperfections are of no consequence.

(purportedly because of a bank error). Equifax bought the check from Sears at face value and then sent Reed a collection letter that was similar to the initial letter sent to Durkin, including the same safe-harbor validation notice. Later, Equifax sent a second letter to Reed, which contained the same form language used in the second letter to Durkin. Reed purportedly received the same third letter as well, but she has not produced that letter. Reed never disputed the debt with Equifax; rather, she paid Equifax $76.30 plus a $25.00 service charge.

The district court consolidated the Durkin and Reed actions. The district court also granted class certification. The class was composed of Illinois residents from whom Equifax tried to collect a debt for a dishonored check written to Funco or Sears during a certain period by using the same or similar form letters received by Durkin and Reed. The class numbered approximately 4,800 individuals.

The plaintiffs' "amended consolidated class action complaint" contained three counts, each alleging a different FDCPA violation. Count one alleged that Equifax's follow-up form letters, i.e., the second and third letters, contradicted and/or overshadowed the safe-harbor validation notice in the initial letter, causing confusion in violation of 15 U.S.C. § 1692g. Count two claimed that a particular sentence in the second letter describing Equifax's procedures for handling debts was misleading in violation of 15 U.S.C. § 1692e. Finally, count three alleged that Equifax's follow-up letters, which contained a toll-free number, violated 15 U.S.C. § 1692f by unfairly obscuring the requirement that certain debt disputes be made in writing.

In arguing for summary judgment, the plaintiffs contended that alleged FDCPA violations were apparent on the face of the collection letters. The district court disagreed but ruled that the case should go to trial since the plaintiffs procured

a linguistics expert, English professor Allan Metcalf, to support their claims of confusion. However, Equifax later filed a motion to bar Metcalf from testifying at trial, which the district court granted. Consequently, the plaintiffs were left with no evidence of confusion beyond the collection letters themselves and their (Durkin, Reed, and one rank-and-file class member) own assertions that the letters were confusing. This development led Equifax to move for summary judgment,[3] arguing that the plaintiffs' evidence was insufficient to go to trial. The district court granted the motion, ruling that the plaintiffs could not proceed to trial relying solely on the letters and their own self-serving testimony. The plaintiffs moved for reconsideration, but the district court declined to alter its summary judgment ruling. The plaintiffs appealed.

## II.

The plaintiffs first maintain that the district court erred in denying them summary judgment. They then alternatively argue for the case to go to trial, attacking the subsequent grant of summary judgment for Equifax. We review a district court's summary judgment decisions de novo, construing all facts in favor of the non-moving party. *See Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

---

[3] The district court denied Equifax's prior summary judgment motion, declining, at that earlier juncture, to rule that the follow-up letters did not violate the FDCPA as a matter of law.

Civ. P. 56(c). In short, "summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Turner*, 330 F.3d at 995.

To determine if the collection letters at issue violate the FDCPA as alleged by the plaintiffs, we examine the letters from the standpoint of the so-called unsophisticated consumer or debtor. *See Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 564-66 (7th Cir. 2004) (reviewing § 1692e, § 1692f, and § 1692g claims under unsophisticated consumer/debtor standard). While the unsophisticated debtor is considered "uninformed, naive, or trusting," he is nonetheless deemed to possess "rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences." *Id.* (internal quotations omitted). Further, the unsophisticated-debtor standard is an objective one and is not the same as the rejected least-sophisticated-debtor standard; accordingly, we disregard unrealistic, peculiar, bizarre, and idiosyncratic interpretations of collection letters. *See Pettit v. Retrieval Masters Creditors Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000); *Gammon v. GC Servs., L.P.*, 27 F.3d 1254, 1257 (7th Cir. 1994). To that end, a mere claim of confusion is not enough: a plaintiff must show that the challenged "language of the letters unacceptably increases the level of confusion." *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1060 (7th Cir. 1999) (emphasis omitted). Under this standard, a plaintiff's anecdotal proclamations of being confused will not suffice: a collection letter cannot be confusing as a matter of law or fact "unless a significant fraction of the population would be similarly misled." *Pettit*, 211 F.3d at 1060; *see also Taylor v. Cavalry Inv., L.L.C.*, 365 F.3d 572, 574-75 (7th Cir. 2004).

In some situations, when an FDCPA violation is so "clearly" evident on the face of a collection letter, a court may award summary judgment to the FDCPA plaintiff. *Avila v. Rubin*, 84 F.3d 222, 226-27 (7th Cir. 1996); *see also*

*Bartlett*, 128 F.3d at 501-02; *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 518-19 (7th Cir. 1997). On the other hand, mere speculation that a collection letter confuses the unsophisticated debtor is not enough for an FDCPA plaintiff to survive an opposing debt collector's summary judgment motion. *See Pettit*, 211 F.3d at 1061; *see also Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997). Thus, when the letter itself does not plainly reveal that it would be confusing to a significant fraction of the population, the plaintiff must come forward with evidence beyond the letter and beyond his own self-serving assertions that the letter is confusing in order to create a genuine issue of material fact for trial. *See Taylor*, 365 F.3d at 574-75; *Chuway v. Nat'l Action Fin. Servs.*, 362 F.3d 944, 948-49 (7th Cir. 2004); *Pettit*, 211 F.3d at 1061-62; *see also Walker v. Nat'l Recovery, Inc.*, 200 F.3d 500, 503-04 (7th Cir. 1999); *Johnson*, 169 F.3d at 1060-61. We have repeatedly indicated that this need for additional evidence (frequently referred to as "extrinsic evidence") might be met through the use of a carefully designed and conducted consumer survey. *See Taylor*, 365 F.3d at 575; *Chuway*, 362 F.3d at 948; *Pettit*, 211 F.3d at 1062; *Walker*, 200 F.3d at 501, 503; *Johnson*, 169 F.3d at 1060-61. Also, we have suggested that an appropriate expert witness might suffice. *See Pettit*, 211 F.3d at 1062.

In this analysis section, we first will address the plaintiffs' arguments in favor of their motion for summary judgment. We then will turn to the plaintiffs' arguments against the grant of summary judgment for Equifax.

## A.  Whether the plaintiffs are entitled to summary judgment.

In arguing in favor of summary judgment, the plaintiffs contend that the collection letters in question violate the FDCPA as matter of law in that the alleged FDCPA vio-

lations are apparent on the face of the letters. With the principles articulated above in mind, we turn to the three alleged FDCPA violations.

### 1.

The FDCPA requires debt collectors to provide debtors with a written validation notice, informing debtors of their rights under § 1692g, including the right to dispute the validity of the debt within thirty days of receiving the notice.[4] *See Bartlett*, 128 F.3d at 498-99. After this thirty-day

---

[4] Subsections (a) and (b) of § 1692g provide:

(a) Notice of debt; contents. Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector

(continued...)

validation period expires, the debt collector may assume that the debt is valid. *See id.* at 498; 15 U.S.C. § 1692g(a)(3). This validation period, however, is not a grace period: a debt collector is "perfectly free" to demand payment and pursue collection efforts, including an appropriate lawsuit against the debtor, within the validation period.[5] *Bartlett,* 128 F.3d at 500-01; *see also Johnson,* 169 F.3d at 1058-59. Thus, during the validation period, the debtor's right to dispute coexists with the debt collector's right to collect.

This coexistence has created a breeding ground for claims of unsophisticated-debtor confusion because, on one hand, the debt collector is telling the debtor that the debtor has the right to dispute, and, on the other hand, the debt collector is telling the debtor to pay. To reduce litigation over such

---

(...continued)

> will provide the consumer with the name and address of the original creditor, if different from the current creditor.

> (b) Disputed debts. If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

15 U.S.C. § 1692g(a)-(b).

[5] Of course, a debt collector must suspend its collection efforts if the debtor disputes or otherwise contests the debt under § 1692g(a). *See* 15 U.S.C. § 1692g(b).

confusion claims, this court, in *Bartlett*, offered debt collec-
tors safe-harbor language for explaining the coexistence of
the right to dispute and the right to collect during the
validation period. 128 F.3d at 501-02; *see also Miller v.
McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214
F.3d 872, 876 (7th Cir. 2000).

Here, Equifax took advantage of our *Bartlett* safe-harbor
language by including it in the initial collection letter.[6]
Importantly, Equifax warned the plaintiffs, consistent with
the *Bartlett* language: "The law does not require us to wait
until the end of the 30-day period before taking action to
collect this debt." Appendix 1. Equifax thus placed the
plaintiffs on notice that something such as the ensuing fol-
low-up letters could be on the way before the validation
period expired. Unsatisfied, the plaintiffs complain that
Equifax's follow-up letters are confusing to unsophisticated
debtors because these letters contradict and/or overshadow
the validation notice in the initial letter. *See Chauncey*, 118
F.3d at 518. According to the plaintiffs, the follow-up letters
confuse because Equifax sent these letters within the valid-
ation period and the letters contained threatening demands
for immediate payment without any reminder about or
reiteration of the validation notice. This argument in favor
of summary judgment comes up short for three reasons.

First, the simple act of demanding payment in a collection
letter during the validation period does not automatically
create an unacceptable level of confusion so as to entitle the
plaintiffs to summary judgment. To be clear, the validation
period is not a grace period. *See Bartlett*, 128 F.3d at 500-01.
Nonetheless, the plaintiffs' view is that virtually all de-

---

[6]  Equifax's appellate counsel reported at oral argument that his
client utilizes our *Bartlett* safe-harbor language nationwide.

mands for payment during the validation period confuse the unsophisticated debtor as a matter of law. (Presumably, the plaintiffs would like no collection letters sent during the validation period.) That view is unsupported by the FDCPA and runs contrary to our case law. If, as this court held in *Bartlett*, a debt collector can bring a lawsuit during the validation period in an effort to collect a debt, *see id.*, then certainly a debt collector can send follow-up collection letters (as well as place telephone calls) demanding payment during the validation period. Demanding payment for an uncontested, overdue debt is an entirely valid tool available to debt collectors, *see Johnson*, 169 F.3d at 1059 ("[B]ona fide debts that are overdue are, well, overdue, and payable pronto."), and the fact that Equifax demanded payment during the validation period does not, in and of itself, justify an award of summary judgment to the plaintiffs.

Second, pursuant to § 1692g(a), a debt collector must include a validation notice in its initial communication to the debtor or must send a validation notice within five days of its initial communication (unless the debtor has paid the debt by that juncture). *See* 15 U.S.C. § 1692g(a). Equifax complied with the language in its initial letter. Once that requirement is satisfied, § 1692g(a) does not mandate that further validation notices be sent. Nonetheless, the plaintiffs point out that a "debt collector may not overshadow or contradict [the validation notice] with other messages sent . . . within the validation period." *Chauncey*, 118 F.3d at 518. To avoid such overshadowing or contradiction, the plaintiffs argue that Equifax should have reiterated or referred to the validation notice in its follow-up collection letters. However, there is no need for such a blanket rule. While some follow-up letters may certainly go over the line, *see*, *e.g.*, *id.* at 518-19, in general, not every follow-up letter demanding payment during the validation period overshad-

ows or contradicts a validation notice; thus, not every follow-up letter sent during the validation period must automatically reiterate the safe-harbor validation notice, refer back to that notice, or remind debtors about the validation period and the time remaining in that period. Therefore, the mere absence of any such reiterations and reminders in the follow-up collection letters does not alone generate an unacceptable level of confusion so as to warrant summary judgment for the plaintiffs. Rather, the matter turns on whether the specific text contains any impermissible overshadowing or contradiction with respect to the validation notice. *See id.*

Third, the specific text in the follow-up letters at issue, contrary to the plaintiffs' assertions, does not "clearly" overshadow or contradict the validation notice from the initial letter so as to entitle the plaintiffs to summary judgment. *Avila*, 84 F.3d at 226-27; *see also Chauncey*, 118 F.3d at 518-19. For instance, these letters do not indicate that the time for disputing the debt has passed. Nor do they misrepresent or cloud the amount of time remaining to dispute the debt. The letters encourage debtors to pay their debts by informing them of the possible negative consequences of failing to pay.[7] The letters simply do not contain any overt misinformation, apparent contradiction, or noticeable lack of clarity concerning the validation period or the debtor's rights under § 1692g. The letters, in short, do not intrinsically prove the

---

[7] Not only does this encouragement promote payment of valid debts, it also promotes disclosing genuine claims of invalid debts (such as Durkin demonstrating the debt resulted from a forgery). Undeniably, one way to encourage someone with a true dispute to come forward and resolve that dispute is to inform him of the possible negative consequences of his continued inaction. Promoting final resolution of such matters, either way, is inherently beneficial.

alleged FDCPA violation. Accordingly, summary judgment is unavailable to the plaintiffs on this claim. (Whether this claim should proceed to trial, however, is a separate matter as discussed below.)

**2.**

The plaintiffs next attack a particular sentence in Equifax's second collection letter under § 1692e. Under this FDCPA provision, a debt collector is subject to civil liability if it "use[s] any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The challenged sentence reads as follows: "Should you fail to pay for this dishonored check or contact this office to make arrangements, *steps will be taken to determine* if your check will be *assigned to an investigator* or *to a collection agency*." Appendix 2 (emphasis added). The plaintiffs assert that, as a matter of law, this sentence is misleading and confusing to the unsophisticated consumer in three respects. However, in construing all inferences in favor of Equifax, as we must in this situation, *see Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005), we reject the plaintiffs' arguments for summary judgment.

The plaintiffs first maintain that the "investigator" in question is not a private investigator but rather an in-house investigator. However, although the investigator is internal, the letter does not, contrary to the plaintiffs' contention, plainly suggest otherwise. It does not indicate that Equifax may refer the matter to an investigator outside of Equifax; it only indicates that Equifax may refer the matter to an investigator, which is entirely true. Next, the plaintiffs complain that, since Equifax is itself a collection agency, the statement that the matter might be referred to a "collection

agency" deceptively implies that the alleged debt has not yet been referred to a collection agency. Nevertheless, the letter does not plainly suggest that Equifax is not a collection agency. Also, this statement is not misleading because, as Equifax indicates, since it purchases dishonored checks from vendors and collects the debts on behalf of itself, it may assign such debts to another collection agency if its own collection efforts prove unsuccessful. Finally, the plaintiffs contest the portion of the sentence stating: "steps will be taken to determine . . . ." The plaintiffs argue that no steps are taken to determine anything; it is all done automatically by computer. However, this statement is simply not deceptive: whether debt information (i.e., the amount of the debt and the amount of time the debt has gone unpaid) is sorted and evaluated by a computer or by a person or by some combination of the two, the assessment still comprises "steps" being "taken." Therefore, contrary to the plaintiffs' contentions, the alleged violations are not so clear as to permit a grant of summary judgment for the plaintiffs. *See Avila*, 84 F.3d at 226-27.

**3.**

Lastly, the plaintiffs accuse Equifax of violating § 1692f. Pursuant to this FDCPA section, a debt collector is subject to civil liability, if it "use[s] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The plaintiffs claim that Equifax unfairly obscured the "in-writing" requirement for debt disputes brought under § 1692g[8] because the follow-up letters, which included a toll-free number, urge debtors to telephone Equifax. It is undisputed that, by using our *Bartlett* safe-harbor language, the initial letter, which also contained a toll-free number,

---

[8]   *See supra* footnote four.

properly informed debtors of § 1692g's in-writing requirement. *See* 128 F.3d at 502. Nonetheless, the plaintiffs maintain that the second letter is unfair and confusing because, in addition to the presence of a toll-free number, the letter suggests that the debtor "contact this office." Appendix 2. Similarly, they contend that the third letter is unfair and confusing because, along with the toll-free number, the letter states: "You may reach our offices at the number below if you wish to discuss this matter further." Appendix 3. To avoid this alleged unfairness and confusion, the plaintiffs argue that Equifax should have reiterated the portion of the safe-harbor notice explaining the in-writing requirement in the follow-up collection letters.

However, neither follow-up letter plainly indicates that disputes do not have to be in writing: contacting the office to discuss the matter does not necessarily equate to telephoning the office to raise a dispute. Further, in the second letter, the verb "contact" does not exclusively mean "call" or "telephone" in this context. One could understand the word "contact" in this situation to mean communicating with Equifax in writing. This understanding is bolstered by the fact that Equifax included its mailing address in the second letter as well as in the third letter. While the plaintiffs focus on the toll-free number, they neglect to pay the same level of attention to the inclusion of Equifax's mailing address. In short, the challenged portions of the follow-up letters do not obviously nullify or undermine the initial letter's explanation of the in-writing requirement. Therefore, in construing all inferences in favor of Equifax, the alleged unfairness and confusion about the "in-writing" requirement in the follow-up letters is not so clear as to justify the grant of summary judgment to the plaintiffs. *See Avila*, 84 F.3d at 226-27. Whether these claims should proceed to trial is, in this case, a separate matter as discussed below.

**B.   Whether Equifax is entitled to summary judgment.**

As stated above, mere speculation that a collection letter confuses the unsophisticated debtor is not enough for an FDCPA plaintiff to survive an opposing debt collector's summary judgment motion. *See Pettit*, 211 F.3d at 1061; *see also Jenkins*, 124 F.3d at 831. Therefore, when the text of the letter does not plainly reveal that it would be confusing to a significant fraction of the population, the plaintiff must come forward with extrinsic evidence, such as a consumer survey, to create a genuine issue of material fact for trial. *See Taylor*, 365 F.3d at 574-75; *Chuway*, 362 F.3d at 948-49; *Pettit*, 211 F.3d at 1061-62; *see also Walker*, 200 F.3d at 503-04; *Johnson*, 169 F.3d at 1060-61.

In order to satisfy the need for extrinsic evidence in this case, the plaintiffs elected not to conduct a survey[9] but instead secured a linguist to support their confusion claims against Equifax. Nevertheless, the district court barred their expert from testifying at trial, finding the expert's testimony irrelevant and unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The plaintiffs, as a result, were left with no evidence of confusion beyond the follow-up letters themselves and their (Durkin, Reed, and one rank-and-file class member) own affidavits claiming that they found the letters to be confusing. The district court ruled that this evidence was insufficient to create a triable issue and thus granted Equifax summary judgment.

The plaintiffs attack this result on three levels. First, they argue that the district court erred in excluding their expert. Second, they contend that, even without their expert, they presented sufficient evidence to proceed to trial. Third, they

---

[9]   When pressed at oral argument to explain why they did not perform a survey, it was evident that the plaintiffs did not want to invest the resources necessary for conducting a survey.

challenge the need for extrinsic evidence in certain FDCPA situations, arguing that the extrinsic evidence requirement conflicts with the unsophisticated-debtor standard. We will address each argument in that order.

## 1.

Turning to the district court's decision to bar the plaintiffs' expert, English professor and linguist Allan Metcalf, our review has two steps. We first review, de novo, "whether the district court properly followed the framework set forth in *Daubert*." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (internal quotation omitted). The first step is satisfied here because, in accordance with the *Daubert* framework,[10] the district court measured both the reliability and the relevance of Metcalf's proffered opinion testimony. *See Ammons*, 368 F.3d at 816 ("This framework requires the district court to determine whether (1) the proposed witness would testify to valid scientific, technical, or other specialized knowledge and (2) his testimony will assist the trier of fact." (internal quotation omitted)); *see also* Fed. R. Evid. 702.

Having determined that the district court properly applied *Daubert*, we next review the district court's decision to bar

---

[10] The plaintiffs' appellate brief contests the applicability of *Daubert*, arguing that "*Daubert*'s criteria for evaluating scientific evidence should not be applied to the opinions of a linguist." However, it is well-established that a court's gatekeeping function under *Daubert*, which is intended to prevent irrelevant and unreliable expert testimony from tainting a case, applies to all expert testimony, not just testimony based on science. *See United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).

an expert for an abuse of discretion. *See Ammons*, 368 F.3d at 816. Here, the district court excluded Metcalf's testimony on two grounds: irrelevant and unreliable. In arriving at this decision, the district court scrutinized Metcalf's affidavit describing his proposed testimony. In the affidavit, Metcalf concluded that, after reviewing the case law defining the unsophisticated debtor, Equifax's three collection letters (including the *Bartlett* safe-harbor validation notice in the initial letter) were difficult to read and were thus confusing to the unsophisticated debtor.

Metcalf based his conclusion in part upon certain readability tests. His test results showed that the letters were difficult to read on account of their long sentences and big words. The district court rejected the test results as irrelevant, holding: "Readability tests analyze the overall letter, rather than the [specific] language [the plaintiffs] single out as increasing their confusion. As such, those results are not relevant here." R.79 at 2. That ruling was not an abuse of discretion. Metcalf's reliance on the overall readability of the letters is off the mark. The issue here is only whether the specifically challenged aspects of the follow-up letters are impermissibly confusing. *See Johnson*, 169 F.3d at 1060. Metcalf's test results are thus too broad for this context and, as a result, this portion of his proposed testimony would not assist the trier of fact.

After discussing his conclusions from the readability tests in the affidavit, Metcalf separately continued on to discuss some of the challenged aspects in the follow-up letters. This latter portion of the affidavit thus does not suffer from the same irrelevance problem as the earlier portion. However, the district court determined that this latter portion—in which Metcalf claimed that the plaintiffs' assertions of confusion were "neither bizarre or idiosyncratic"—was unreliable for purposes of *Daubert*:

> [A]though Dr. Metcalf avers that he reviewed the letters
> and found them confusing, he fails to explain how he
> reached that conclusion. The Court will not presume, as
> [the plaintiffs] appear to suggest, that Dr. Metcalf is
> qualified to offer such testimony simply because he is
> an English professor and [a] linguist. . . . Because
> Dr. Metcalf has not sufficiently articulated the manner
> and method by which he determined the [challenged]
> language was confusing, the Court finds his testimony
> unreliable.

R.79 at 2. This assessment of Metcalf's affidavit and pro-
posed testimony is fair. In the pertinent portion of the
affidavit, Metcalf recited the plaintiffs' claims of confusion
and then simply endorsed those claims. Under *Daubert* and
Federal Rule of Evidence 702,[11] "[a]n expert must offer good
reason to think that his approach produces an accurate es-
timate using professional methods, and this estimate must
be testable." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395
F.3d 416, 419 (7th Cir. 2005). Accordingly, the district court
did not abuse its discretion by excluding Metcalf's untest-
able say-so. *See id.*

Lastly, the plaintiffs argue that, even if Metcalf's opinion
is inadmissible as an expert opinion, it should still be ad-
mitted as the "opinion of an objective observer." In support

---

[11] Fed. R. Evid. 702: "If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by
knowledge, skill, experience, training, or education, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony
is based upon sufficient facts or data, (2) the testimony is the
product of reliable principles and methods, and (3) the witness
has applied the principles and methods reliably to the facts of the
case."

of this argument, the plaintiffs cite a sentence from *Pettit v. Retrieval Masters Creditors Bureau* in which we said: "The self-serving opinion of the plaintiff, clearly not an expert or an objective observer, does not create a genuine issue for trial." 211 F.3d at 1062. The plaintiffs misinterpret this sentence. The words "objective observer" in that sentence only explain what the plaintiff in that case was not. More important, contrary to the plaintiffs' interpretation, the opinion of a single non-expert (i.e., lay) witness is not a sufficient basis for showing that a significant fraction of the population would agree with the plaintiffs' claims of confusion. *See Taylor*, 365 F.3d at 574-75. Certainly, when a multitude of lay opinions about confusion are compiled in an appropriate consumer survey, that survey may be helpful. *See Taylor*, 365 F.3d at 574-75; *Chuway*, 362 F.3d at 948; *Walker*, 200 F.3d at 501-04; *Johnson*, 169 F.3d at 1060-61. A solitary lay witness's opinion, however, does not cut it.

**2.**

Even with their expert barred, the plaintiffs maintain that they presented sufficient evidence to survive summary judgment and go to trial. Essentially, the plaintiffs are arguing that extrinsic evidence is not needed in this case to create a triable issue. To support this argument, they heavily rely upon the following passage from our recent decision in *Chuway v. National Action Financial Services*:

> If it is apparent just from reading the letter that it is unclear and the plaintiff testifies credibly that she was indeed confused and that . . . she is representative of the type of people who received that or a similar letter, no further evidence is necessary to create a triable issue.

362 F.3d at 948 (citations omitted). The flaw, however, in the plaintiffs' argument is that—unlike the situation in *Chuway*

when the letter at issue was confusing to each panel member[12]—it is *not* apparent from just reading the follow-up letters that they are unclear. Viewing the evidence in a light most favorable to the plaintiffs, there is no obvious contradiction or overshadowing or falsity or unfairness in these letters as they allege. Therefore, this language from *Chuway* is of no value to the plaintiffs. Rather, it is the next sentence in the *Chuway* opinion that governs in this case:

> But if it is unclear whether the letter would confuse intended recipients of it, then to make out a prima facie case the plaintiff has to go further and present evidence (beyond her own say-so) of confusion, for example in the form of a carefully designed and conducted consumer survey.

*Id.*

In short, "[w]hile there may be some merit to" the plaintiffs' claims that the follow-up letters are confusing, misleading, and unfair, the merit of these claims is not apparent, and the mere possibility of merit does not create a triable issue. *Pettit*, 211 F.3d at 1061-62; *see also Taylor*, 365 F.3d at 574-75; *Jenkins*, 124 F.3d at 831. To proceed to trial, the plaintiffs were thus required to submit evidence in addition to the letters and their affidavits. *See Taylor*, 365 F.3d at 574-75; *Chuway*, 362 F.3d at 948; *Pettit*, 211 F.3d at 1061-62; *see also Walker*, 200 F.3d at 503-04; *Johnson*, 169 F.3d at 1060-61. Despite our line of cases on this issue, they chose not to conduct a survey, and they also failed to bring forth a relevant and reliable expert. *See Taylor*, 365 F.3d at 574-75; *Chuway*, 362 F.3d at 948; *Pettit*, 211 F.3d at 1061-62; *Walker*, 200 F.3d

---

[12] *Chuway*, 362 F.3d at 948 ("the entire bench was confused about the meaning of the letter until the defendant's lawyer explained it to us at the oral argument").

at 501-04; *Johnson*, 169 F.3d at 1060-61. As a consequence, the plaintiffs are in the same disadvantageous evidentiary position as other plaintiffs that have gone before them: their FDCPA claims against Equifax are supported by nothing more than speculation and conjecture, which does not enable them to survive summary judgment. *See Taylor*, 365 F.3d at 574-75; *Pettit*, 211 F.3d at 1061-62; *see also Jenkins*, 124 F.3d at 831.

**3.**

Finally, in a last-ditch effort to salvage their case, the plaintiffs attack the extrinsic evidence requirement for cases, such as theirs, in which the claims of confusion are not apparent. The plaintiffs argue that the extrinsic evidence requirement is inconsistent with the unsophisticated-debtor standard because the unsophisticated debtor is a hypothetical person whose perceptions cannot be surveyed.

The unsophisticated-debtor standard, however, is not as indistinct as the plaintiffs believe. As stated above, the unsophisticated debtor will not be deemed to be confused "unless a significant fraction of the population would be similarly misled." *Pettit*, 211 F.3d at 1060; *see also Taylor*, 365 F.3d at 574-75. Presenting evidence to make such a showing is the objective. Requiring extrinsic evidence in situations such as this is not inconsistent with the unsophisticated-debtor standard; rather, such evidence is an essential component of the standard. It ensures that unrealistic, peculiar, bizarre, and idiosyncratic interpretations of collection letters do not prevail. *See Pettit*, 211 F.3d at 1060; *Gammon*, 27 F.3d at 1257. In other words, it protects against the repudiated least-sophisticated-debtor standard slipping in through the back door:

> Because we have rejected the "least sophisticated consumer" approach, the plaintiff will have to show that a significant fraction of the letter's addressees were deceived—for if showing a handful of misled debtors were enough, we would as a practical matter be using the "least sophisticated consumer" doctrine.

*Gammon*, 27 F.3d at 1260 (Easterbrook, J., concurring). Extrinsic evidence, moreover, can actually come to the aid of plaintiffs. For instance, in discussing why a district court prematurely terminated a case, we observed in *Johnson v. Revenue Management Corporation*:

> Unsophisticated readers may require more explanation than do federal judges; what seems pellucid to a judge, a legally sophisticated reader, may be opaque to someone whose formal education ended after sixth grade. To learn how an unsophisticated reader reacts to a letter, the judge may need to receive evidence.

169 F.3d at 1060. Furthermore, the plaintiffs have not pointed to any supervening developments that would necessitate changing our course. *See Debs v. N.E. Ill. Univ.*, 153 F.3d 390, 394 (7th Cir. 1998). For all of these reasons, the plaintiffs have not offered a compelling reason to overturn our well-reasoned precedent, *see id.*, and we thus reject their challenge.


### III.

The plaintiffs claim that two collection letters that followed an initial letter containing a safe-harbor validation notice are confusing, misleading, and unfair. The merits of their claims, however, are not apparent just from a reading of the follow-up letters, and they failed to bring forth admissible extrinsic evidence to support their claims. Accordingly, they cannot proceed to trial, and they are certainly not

entitled to summary judgment. The judgment of the district court in favor of Equifax is therefore AFFIRMED.

**Appendix 1: Equifax's First Letter to Durkin**

**Appendix 2: Equifax's Second Letter to Durkin**

**Appendix 3: Equifax's Third Letter to Durkin**

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*